LABOR RELATIONS COMMISSION *vs.* BOSTON TEACHERS UNION, LOCAL 66, & others.

Suffolk. March 8, 1977. — December 28, 1977.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, & ABRAMS, JJ.

*Contempt. Public Employment,* Labor dispute. *Voluntary Association,* Labor union.

A contempt petition alleging that the named union officials "authorized and ratified" a strike and other conduct proscribed by G. L. c. 150E, § 9A (a), and that such conduct was in violation of outstanding court orders was insufficiently specific to give the defendants notice that their conduct in failing to disavow a sanction sheet distributed to union members formed the basis of the contempt citation. [87-88]

A contempt petition alleging that the named union officials "authorized and ratified" a strike and other conduct proscribed by G. L. c. 150E, § 9A (*a*), was sufficiently specific to give the defendants notice that their conduct in condoning or encouraging a strike formed the basis of the contempt citation. [88]

In a contempt proceeding for alleged violation of a restraining order prohibiting the defendant union and named union officials from striking in violation of G. L. c. 150E, § 9A (*a*), or "instigating, ratifying or threatening" to strike, evidence that the union officials, having knowledge of the membership's vote to strike unless an acceptable offer was made by its employer prior to a certain date, and of a notice in a "fact sheet" issued over the defendants' signatures proclaiming that a strike would commence on a certain date if the offer were rejected, as well as knowledge of the terms of the injunction, took no action to inform the union membership of the injunction nor any other action to dissipate the effect of prior events supported a finding that the union officials had clearly disobeyed the injunction. [88-91]

In a contempt proceeding for violation of an injunction prohibiting a union from striking in violation of G. L. c. 150E, § 9A (*a*), the record did not support the defendants' contention that on a particular date there was no strike activity and that the fines assessed including that date were therefore excessive. [92]

The provisions of G. L. c. 150E, § 15, establishing certain penalties for strikes by public employees, did not preclude the assessment of fines in a contempt proceeding against defendants who had been enjoined from striking in violation of c. 150E, § 9 (*a*). [92-93]

An unincorporated association of public employees was given entity status by the provisions of G. L. c. 150E and could, therefore, be a party to a contempt proceeding and have fines assessed against it. [93-96]

CIVIL ACTION commenced in the Superior Court on September 18, 1975.

A petition for contempt was heard by *Adams*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*John F. McMahon* for the defendants.

*Stuart A. Kaufman* for the plaintiff.

LIACOS, J. This is an appeal from a series of judgments entered in the Superior Court, Suffolk County, in which the Boston Teachers Union, Local 66 (union), and five individual defendants, as representatives of a class of defendants,

were found to be in civil contempt of certain orders of the court. Those orders concerned labor negotiations between the union and the School Committee of Boston (committee). The court assessed fines against both the union and the individual defendants. In addition, the court assessed costs to the union under Mass. R. Civ. P. 54, 365 Mass. 820 (1974). The union and five of the named defendants, Henry Robinson, Joan Buckley, Philip Pirrone, Thomas Gosnell, and Charles McGowan, appealed from these judgments to the Appeals Court. We transferred the case here on our own motion.

We affirm the judgments of contempt as to the union and as to the individual defendant, McGowan. As to the individual defendants Robinson, Buckley, and Gosnell, we affirm the judgments of contempt except as to those judgments based on a finding of violation of a temporary restraining order (described below) relating to the distribution of so called "sanction" sheets. We reverse the judgment of contempt as to Pirrone, it being based solely on a finding of violation of the temporary restraining order (paragraph C) dealing with the "sanction" sheets, and similarly reverse the judgments based on alleged violations of paragraph C by the defendants Robinson, Buckley, and Gosnell.

1. This case is an outgrowth of apparently difficult negotiations between the union and the committee for a collective bargaining agreement to cover the 1975-1976 school term. Before negotiations were concluded the union struck the city school system.

At a meeting of the union membership held on September 2, 1975, the membership voted to commence a strike on September 22, 1975, unless the committee made an acceptable contract offer prior to that time. At that same meeting the membership also authorized the union's executive board to draw up a list of sanctions that would be taken against union members who failed to abide by the majority decision to strike the school system should the negotiations be unsuccessful.

As a result of the action taken at the meeting, the committee filed a petition on September 12 with the Labor Relations Commission (commission) for a strike investigation under G. L. c. 150E, § 9A (b). Such an investigation was conducted. The commission, on September 17, issued an interim order which contained findings that a strike was threatened and that union representatives had "encouraged and condoned" such action. The commission ordered, inter alia, that the union "cease and desist from encouraging or condoning the threatened strike." The order was later modified in portions not relevant on this appeal.

During the pendency of the commission's investigation, Robinson and Buckley caused to be distributed on September 16 and 17 so called "fact sheets" detailing the progress or lack thereof in the negotiations. These "fact sheets" contained a notice of a membership meeting for September 21, at which time the last offer of the committee was to be presented for either ratification or rejection. The notice then stated that, if the offer was rejected, the union would strike beginning Monday, September 22. On September 18, the union distributed the sanction sheet authorized at the September 2 meeting and drawn up by the executive board in accordance with the membership's authorization.

Also on September 18 the commission, alleging that neither the union nor the committee was complying with its previous order, commenced a civil action in the Superior Court. The complaint sought to enjoin the parties to the negotiations from failing to comply with the orders. A judge of the Superior Court issued preliminary injunctions enforcing the commission's orders.

The next day, September 19, another judge of the Superior Court amended the previously issued preliminary injunction, apparently to conform to the specificity requirements of Mass. R. Civ. P. 65 (d), 365 Mass. 832 (1974). The amended injunction incorporated, inter alia, so much of the commission's earlier orders as sought to enjoin the union from "encouraging or condoning the threatened strike."

The commission again went to court on September 19 with a motion to amend its complaint and an application for a temporary restraining order. The amendment, in apparent compliance with Mass. R. Civ. P. 23.2, 365 Mass. 769 (1974) (actions relating to unincorporated associations), was allowed; it named Robinson, union president, and Buckley, executive vice-president, individually and as representative defendants of a class consisting of the "officers, agents and members of the Union and other employees represented by the Union." The restraining order provided, in relevant part, that the defendants were to be temporarily restrained from: "(a) striking, engaging in a work stoppage, or work slowdown or any other conduct proscribed by G. L. c. 150E, s. 9A(a); (b) instigating, authorizing, ratifying or threatening any of the above acts; (c) making any future threats or taking any action with respect to past threats, in connection with, or otherwise imposing any sanctions or punishments against Union Members and Employees represented by the Union who cross a Union picket line or who fail or refuse to strike, to engage in a work stoppage or work slowdown or other conduct proscribed by G.L. c. 150E, s.9A (a)."

The next crucial event occurred at the membership meeting of September 21. At that meeting, which was chaired by Robinson, the unanimous recommendation of the union negotiating team to reject the committee's latest offer was approved by the membership pursuant to a motion made by Buckley. No separate vote was taken on the strike issue nor did either Robinson or Buckley take any action to inform the membership about the consequences of their effectuating the earlier strike resolution.

On Monday, September 22, the threat of the strike was realized and picket lines were established at Boston schools. Thereupon, the commission filed a petition to have the defendants held in contempt of court. In addition to the union, the petition named Robinson, Buckley, and two other union officers, as well as Gosnell, McGowan, Pirrone and other members of the executive board. The petition

alleged (1) that the union membership had adopted Robinson's recommendation to reject the proposal;[1] (2) that the union was engaged in a strike proscribed by c. 150E, § 9A (a); (3) that the named individual defendants authorized and ratified the strike; (4) that, as a result of this action, picket lines had been established at several schools and the delivery of education had been impaired; (5) that the defendants' conduct constituted "a willful and undoubtful disobedience of this Court's clear and unequivocal commands, contained in its Preliminary Injunction and Temporary Restraining Order."

Hearings on the contempt petition were held on September 23, 25, 29, 30, and October 16. The defendants did not contest the findings of contempt on the part of the union; rather they argue that it was error for the court to impose fines on the union as an entity. That issue will be discussed in due course. The basic issue raised in this appeal, however, is whether the court was justified in finding the five named defendants in contempt of the orders of the court. For the sake of clarity the facts underlying the adjudication of each shall be stated separately.

A. *Henry Robinson.* Robinson was found in contempt of so much of the preliminary injunction as enjoined him from "encouraging or condoning" the strike action and so much of the temporary restraining order as sought to prohibit him from "instigating, authorizing, ratifying or threatening" any strike, work stoppage or slowdown or other conduct proscribed by c. 150E, § 9A (a), prior to September 23. For

---

[1]The union insists that there is nothing in the record to support the view that Robinson made any recommendations to the membership, and, to the contrary, that he did nothing more than act as parliamentary chairman of the September 21 meeting. The record does indicate, however, that Robinson announced the recommendation of the negotiating team, of which he was a member, to reject the committee's offer. Buckley, not Robinson, moved to reject the offer. In view of the more inclusive allegation of the petition numbered (3) above that the named defendants authorized and ratified the strike, we do not believe that any variance between the facts as established in the record and the assertion that Robinson made no recommendation is of controlling significance.

these actions he was fined $1,000. In addition, he was held in contempt for his actions relative to the sanction sheet in violation of the temporary restraining order, but was purged of the contempt by subsequently complying with an order of the court issued on September 23.[2]

The record indicates that the basis of the contempt finding with regard to the strike was Robinson's failure, in his roles as chairman of the membership meeting and president of the local, to bring to the attention of the membership at the September 21 meeting the fact that the court had issued an order against the strike scheduled for the next day, or to suggest that the membership rescind its September 2 strike resolution. That the court viewed this duty as implicit in the earlier court orders is made clear by the judge's statement: "You say it was a perfunctory performance as officer . . . as Chairman of the meeting and, . . . if I agree with you that is his sole function, that he has no higher responsibility or duty, that would be the end of paragraphs B and C of the temporary restraining order." A similar rationale formed the basis of the contempt adjudication relative to Robinson's failure prior to September 23 to disavow the so called "sanction sheet."

B. *Joan Buckley.* Buckley was found in contempt for violating the same provisions of the outstanding orders as was Robinson. Like the union president, she was fined $1,000 for those actions in the period after the issuance of the orders but prior to September 23, and similarly was found to have purged herself of any contempt with respect to the sanction sheet. The adjudication of contempt was due to her failure, as an executive vice-president of the union, to take any action on the membership's rejection of the contract offer, to call to the membership's attention the relevant court orders, or to take any action to either disavow the strike or

---

[2] The subsequent purge from contempt does not make this issue moot as it is possible the defendants could suffer collateral consequences as a result of the adjudication. *Garabedian* v. *Commonwealth,* 336 Mass. 119, 120 (1957). In any event the commission has not urged that we treat this particular issue as moot.

disclaim the sanction sheet. Buckley testified that she did not believe the terms of the court orders required her to take such affirmative action.[3]

C. *Philip Pirrone.* Pirrone was adjudged in contempt for violating so much of the temporary restraining order as dealt with the issue of sanctions against nonstriking union members. The evidence tended to show that Pirrone, as a member of the executive board of the union, was aware that a sanction sheet would be distributed to the members and made no effort to disavow it after its distribution. As was the case with the other defendants, his actions subsequent to September 23 were deemed to have purged him of the contempt of this aspect of the court order.

D. *Thomas Gosnell.* Gosnell was found in contempt for violating the same portion of the temporary restraining order as was Pirrone (and like Pirrone was purged of such contempt along similar lines), as well as the portion of the earlier preliminary injunction restraining him from encouraging or condoning the strike. As the latter finding has not been argued on the merits, but only as to the amount of the fine imposed, we need not recount the evidence relative to the finding on the merits.

In so far as his actions concerning the sanction sheet are concerned, the record indicates that as a member of the executive board, Gosnell had become involved in the drafting and approval of the sanction list. Like the other defendants so charged, Gosnell did not take any action to disavow the sanctions after it became clear that the union would strike despite his admitted recognition that there might be "legal problems" with the sanctions as promulgated by the executive board. The fault found by the judge was Gosnell's failure to "bring to the attention of the members that those sanctions would not be imposed as a member of the committee who had voted the sanctions and distributed the list to the members."

---

[3] At a later point in the hearing the judge differentiated between the duties incumbent on the officers, as opposed to members, of the executive board.

E. *Charles McGowan.* McGowan was found in contempt for violating paragraph A of the preliminary injunction, dated September 18, 1975, and the temporary restraining order, dated September 19, 1975, prohibiting a strike. The defendants have not argued, in substance, why this adjudication is in error, but contest only the amount of the fine. We will consider the facts relative to that argument at appropriate points in this opinion.

2. We have outlined the sequence of events which resulted in the contempt adjudication and have set forth the basis on which the individual defendants were held liable for contempt. We now proceed to consider the merits of the defendants' arguments on appeal.

In essence, the defendants' arguments on the merits reduce to two fundamental propositions. First, they claim the conduct forming the basis of the contempt adjudications cannot, as matter of law, be considered a clear and undoubted disobedience of a clear and unequivocal command. *Nickerson* v. *Dowd,* 342 Mass. 462, 464 (1961). Second, even assuming the presence of the first, the petition for contempt did not provide the required prehearing notice as to what acts were alleged to have constituted the contempt.

Evaluating these arguments we find that all those contempt adjudications concerning the distribution of the so called sanction sheet must be reversed. We rest this decision not on the degree of specificity contained in the restraining order but the failure of the petition for contempt filed by the commission to apprise adequately the defendants of the underlying charge as it related to the distribution of the sanction sheet.

It is clear, beyond any doubt, that the requirements of due process, as well as fundamental fairness, require that one must be given notice of charges prior to a hearing on civil contempt whenever the allegedly contemptuous conduct occurred outside the presence of the court. *Sodones* v. *Sodones,* 366 Mass. 121, 128-129 (1974). See *Meranto* v. *Meranto,* 366 Mass. 720, 724 (1975). Not only must the charges per se be set forth with adequate specificity, but

there must be a description of the specific acts which underlie the charges. *Meranto v. Meranto, supra.* The petition here fails to meet this standard.

The paragraphs setting forth the operative facts on which the petition is based state in essence: (1) that Robinson presided at the meeting where the committee offer was rejected; (2) that the named defendants "authorized and ratified" the strike and other conduct proscribed by c. 150E, § 9A (*a*); and (3) that such conduct was in violation of the outstanding court orders. Under *Sodones,* the last allegation has no significance in terms of informing the defendants of the alleged contemptuous act. The first allegation concerns facts which did not form the basis of the contempt adjudication in regard to the sanction sheet. Thus the only aspect of the petition which may be said to approach satisfying due process was the second stated allegation. Given the absence of any specific reference to the sanction sheet or any actions of the defendants with respect to it which were deemed in violation of the court order it must be deemed insufficient. In the absence of any language which could be deemed to have put the individual defendants on notice that their conduct concerning the sanction sheet was the basis of the contempt citation, those decisions must be reversed.

On the other hand the allegation of the petition, which stated that the defendants authorized and ratified the strike and other activities proscribed by § 9A (*a*), is sufficient notice concerning the other adjudications for contempt. The ultimate act, the strike, for which their conduct was called into question, was specifically set forth. Moreover, we consider the terms "authorized and ratified" to have been a sufficient notice of the particular conduct at issue. Cf. *Sodones v. Sodones, supra* at 129.

The question remains whether there was the unquestioned disobedience to clear and unequivocal commands of the court, *Nickerson v. Dowd, supra,* concerning the actions of the named defendants in regard to the strike itself. Pirrone was acquitted on this count. There does not appear to be a contest as to the merits (as opposed to the fine com-

putation) of this part of the order in so far as Gosnell and
McGowan are concerned. Thus we are left only with decid-
ing whether the orders outstanding on September 23 consti-
tuted such a command to Robinson and Buckley, and if so
whether there was clear disobedience thereof. The defend-
ants argue that the required specificity was lacking. The
record clearly indicates that the judge predicated his con-
tempt orders on the view that Robinson and Buckley were
under an obligation to take affirmative action to inform the
union membership of the outstanding preliminary injunc-
tion and temporary restraining order. The defendants con-
tend, however, that, since such an obligation was not made
explicit in the injunction or order, legal liability cannot at-
tach for a failure to comply with the implicit requirements.
The commission argues that such a duty was readily under-
standable and urges affirmance. Although the facts present
a close question, we agree with the position taken by the
commission. While we are sensitive to the fact that
"[a]mbiguity lurks in generality and may thus become an
instrument of severity," *McComb* v. *Jacksonville Paper Co.*,
336 U.S. 187, 197 (1949) (Frankfurter, J., dissenting), we
do not believe that such dangers are presented by upholding
the contempt findings in this case.

The prohibited acts contained in the injunction and order
outstanding against the named defendants, in so far as their
actions relative to the strike are concerned, restrained them
from taking affirmative actions to either encourage, insti-
gate, authorize or threaten the particular action. Each of
those words in its plain meaning seems to envision specific
acts or actions which would result in the occurrence of a
strike. The defendants were also prohibited, however, from
condoning or ratifying such actions. We believe that the
plain meaning of these latter terms was intended to put, and
should have put, the defendants on notice that not only
would certain positive acts be the basis of contempt cita-
tions, but that the failure to act in appropriate situations
would render them similarly liable. Moreover, in terms of
enforcing the general strike prohibitions of § 9A, see *Direc-*

*tor of the Div. of Employee Relations of the Dep't of Administration & Fin.* v. *Labor Relations Comm'n,* 370 Mass. 162 (1976), it is clear that a court could contemplate that inaction by the union leader in appropriate circumstances could have the same deleterious effects as could affirmative action. The court, in adding the individual defendants as class representatives, clearly recognized that as officers of the union they were a natural conduit for communication to the union rank and file. See *Oil Workers Int'l Union* v. *Superior Court,* 103 Cal. App. 2d 512, 557 (1951). By so adding them the court obviously intended to impose duties beyond those to which as members of the union they were already subject prior to the amendment of the complaint.

The facts in this case support the view that the defendants failed to honor these responsibilities. It is not disputed that Robinson and Buckley were intimately familiar with: (1) the vote of the membership on September 2 to strike on September 22 unless an acceptable offer was made by the committee; (2) the notice in the "fact sheets" of September 16 and 17, issued over the signatures of these two union officers, proclaiming that the strike would commence on September 22 if the offer was rejected at the meeting scheduled for September 21; (3) the terms of the preliminary injunctions and temporary restraining order issued on September 18 and 19 placing on the named defendants the responsibility, among other things, not to condone or ratify actions which could lead to a strike; and (4) the fact that the membership rejected the last offer by the committee at the September 21 meeting. Following that rejection, the force of the September 2 strike vote and of the two fact sheet reminders was clearly at work to propel the union membership toward a strike on the following day. After having taken active roles in creating that momentum, Robinson and Buckley took no steps to dissipate the effect of their previous actions and the actions of the membership. Instead, they assumed what they characterize as a passive role despite the apparent possibility that the court's important goal of avoiding a strike was about to be frustrated. This is

not to say that Robinson and Buckley could be punished for their actions prior to the issuance of the orders for which they were held in contempt. Rather, it is to recognize that on September 21 they were aware of the possible consequences of the vote to reject the committee's offer, and yet stood idly by and let the force of prior events carry the membership to a strike on the following morning.

We cannot conclude on these facts that the clearly expressed and presumably understood goals of the Legislature, the commission, and the court could be frustrated by such an ostrich-like attitude on the part of the responsible leaders. If, in these circumstances, Robinson and Buckley were left with any legitimate doubt as to their responsibilities under the injunction and the restraining order, they should have assumed the initiative to make certain that their conduct did not violate the terms of the court orders. "[I]f the defendant saw the decree as ambiguous on the point in question he could have sought clarification from the court before he engaged in the questionable conduct."[4] *Coyne Indus. Laundry of Schenectady, Inc.* v. *Gould,* 359 Mass. 269, 275-276 (1971).

3. Having affirmed the contempt orders on the merits, we must now consider certain arguments raised by the union regarding the imposition and computation of fines relative to the named defendants and the union. The arguments asserted by the defendants are (a) that in regard to the defendants McGowan and Gosnell, the fines assessed were excessive as they included September 29, a day on which there was no strike activity; (b) that in regard to all the individual defendants, the provisions of c. 150E, § 15, are the exclusive remedy; and (c) that fines cannot be assessed

---

[4] There is some indication in the record that counsel for the union asked the judge prior to the September 21 meeting whether the act of presiding at the meeting would constitute contempt of the outstanding court order, and that the judge answered it would not. We find this advice to be entirely consistent with an expectation that the presiding officer would not allow important decisions to be made by the membership in ignorance of the clear intention of the court to coerce compliance with the no-strike provisions of § 9A.

against the union qua union due to its status as an unincorporated association. We treat these arguments separately.

(a) The contention that the fines against McGowan and Gosnell should be reduced is based on the fact that the total fines assessed against each of them include September 29, a day on which the union contends that there was no strike or other activity. The judge's order implicitly is based on the opposite conclusion and we may not overturn that conclusion unless we deem it clearly erroneous. Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974). We have reviewed the record. We find no basis for disturbing the judge's findings in light of the fact that the evidence presented to him showed that only a tentative agreement had been reached the morning of September 29. There was no evidence of any resumption of work by the two defendants on that day. Moreover, there is a permissible inference based on a statement by counsel for the defendants that the following day, September 30, was the earliest a work resumption could be expected. There was no error in this regard.

(b) The second contention is based on c. 150E, § 15, which provides for certain penalties for violation of the commands of c. 150E. The argument is that § 15 establishes a comprehensive enforcement scheme that precludes application of other remedies. See *School Comm. of Lowell* v. *Mayor of Lowell,* 265 Mass. 353, 356 (1928). We do not agree, however, with the defendants' characterization of § 15. Its purpose is to limit the penalties which may be exacted by public employers against employees participating in a strike. While the existence of the sanctions may serve as a deterrent to such activities by public employees, we do not believe that such sanctions are applicable to the issue of achieving compliance with lawfully issued orders of a court. See *Godard* v. *Babson-Dow Mfg. Co.,* 319 Mass. 345 (1946).

Moreover, as the commission is authorized under § 9A to obtain court enforcement of its orders in a strike situation, we do not believe that the Legislature could have intended to nullify that right by denying resort to the contempt

power. The defendants' argument in this respect is without merit.

(c) Finally, the union argues that, as an unincorporated association, it cannot, in the capacity of a union, be a party to a contempt proceeding or have fines assessed against it. See *McCormack* v. *Labor Relations Comm'n*, 358 Mass. 682 (1971). The commission in response argues in the alternative (1) that we should reconsider our prior decisions relative to the capacity of an unincorporated association to sue or to be sued; (2) that G. L. c. 150E confers entity status on the union; and (3) that the contempt adjudication was not against the union qua union, but against the union in so far as it was composed of the entire class of defendants.

We do not reach the arguments raised by the union against adopting the first or third position, as we decide the point on the second ground stated. We agree with the commission that c. 150E, § 1 et seq., reveals a legislative intent to allow a union to be a party in a proceeding under c. 150E. See especially §§ 4, 5. It follows that the union properly was made a party to the contempt proceeding, and the fine leveled against it must therefore be affirmed.[5]

When c. 150E, § 1 et seq., was enacted in 1973, it represented a comprehensive revision of the statutory schemes which previously regulated the organizational and collective bargaining rights of public employees. *Boston Teachers Local 66* v. *School Comm. of Boston*, 370 Mass. 455, 472-473 (1976). See Sherry, Labor Law, 1979 Ann. Survey Mass. Law § 2.12. While there are great similarities in both operation and language between c. 150E and the predecessor statutes, G. L. c. 149, §§ 178F-178N, there are also crucial differences. Moreover, the meaning, scope, and effect of the sections must be ascertained in light of the expanded legislative purpose evident in the enactment of c. 150E.

The most crucial difference for purposes of this case lies in the expanded scope of the prohibition against strikes con-

---

[5] The union does not allege that the amount of the fine was excessive.

tained in c. 150E, § 9A (a), as compared to the predecessor statutes, G. L. c. 149, § 178F (10), and G. L. c. 149, § 178M. The scope of the prohibition in the early statutes runs against public employees only; whereas the prohibition in § 9A (a) runs not only against "public employees" but "employee organizations" as well. The inclusion of the latter is not without significance. There is an implicit legislative recognition in this inclusion of "employee organizations" that such organizations may function in all respects as an entity and may in their capacity as an organization, irrespective of legal status, properly be made the subject of a court order and legal prohibition.

Other provisions of c. 150E suggest not only a legislative perception of the union as a potential defendant and object of legal prohibition under § 9A (a), but also suggest that the union may act affirmatively in its capacity as an employee organization. Thus § 4 grants such organization the power to assume the status of exclusive bargaining representative; § 7 authorizes the organization to execute collective bargaining agreements; § 10 delineates certain prohibited practices from which "an employee organization or its designated agent" shall refrain from engaging. Like the provision of § 9A (a), these sections of the statute envision a union acting for all intents and purposes as a legal entity.

The union argues, however, that there is a great similarity between the previously adverted to provisions of c. 150E and predecessor provisions in G. L. c. 149, §§ 178I, 178K, and 178L, repealed by St. 1973, c. 1078, § 1. Pointing to our decision in *McCormack* v. *Labor Relations Comm'n*, 358 Mass. 682 (1971), wherein we adhered to our rules relative to unincorporated associations in a case involving G. L. c. 149, the union argues that that case is well-nigh dispositive of the issue under c. 150E. Were the issue raised and decided in *McCormack*, then even irrespective of the difference in § 9A (a) we might tend to agree. However, the opinion in that case does not reveal that the effect of c. 149 on our traditional rule was ever considered and an examination of the briefs in the case shows that the issue was not

raised. Thus, *McCormack* cannot be considered controlling authority.

The union's position fails to account for the impact of the change which c. 150E effectuated in the labor relations law of the Commonwealth concerning public employees. The obvious effect of the expansion of the bargaining and organizational power of public employees was an increase in the power of employee organizations.

The purpose behind such recognition is particularly evident in this case. While the Legislature clearly intended to forbid strikes by public employees, it was also cognizant of the possibility that such strikes were not unlikely, based on previous experience in Massachusetts and other jurisdictions, *School Comm. of Boston* v. *Reilly*, 362 Mass. 334 (1972); *New York* v. *DeLury*, 23 N.Y.2d 175 (1968), thus accounting for the power granted to the commission in § 9A (*a*). It also presumably was cognizant of the greater likelihood that such strikes would take place with an expanded scope of organizational rights.

Since the Legislature was cognizant of our preexisting rules relative to unincorporated associations, *Mathewson* v. *Contributory Retirement Appeal Bd.*, 335 Mass. 610, 614 (1957), it presumably meant to override those rules if necessary to allow the commission and the courts to implement the strike prohibition. As the inclusion of "employee organization" within the scope of § 9A (*a*) indicates, there is an implicit recognition that, if a proceeding for injunctive relief necessitated collateral contempt proceedings, the ability to obtain compliance through the use of coercive measures was more likely to be effective against the union as a whole than against only representative defendants of a class.[6] To hold otherwise would mean that in spite of attempts at the time

---

[6] Under the view we take of the statute, the motion to amend to add Robinson and Buckley "individually and as representatives of a class of Union members, and other employees represented by the Union" made under Mass. R. Civ. P. 23.2 appears unnecessary except so as to join them individually. This surplusage in no way redounds to the benefit of the union's argument on this issue. Moreover, the preliminary injunction was specifically directed to the union.

of enactment of c. 150E to grant the right to strike which were rejected, see 1973 House Doc. Nos. 542 and 2549, the Legislature intended to deprive the courts of their most potent weapon to assure the effectuation of the no-strike mandate. We cannot attribute to the Legislature such an intent in light of the language of the statute and its evident legislative purpose. It therefore follows that the fine against the union must be affirmed.[7]

The final point raised by the defendants is to contest the judge's imposition of costs under Mass. R. Civ. P. 54 (d), 365 Mass. 820 (1974). The matter is for the discretion of the judge and we cannot say that he abused it.

The judgments are affirmed in part and reversed in part, in the manner previously stated.

*So ordered.*

---

[7] The union notes that there is a legislatively established procedure for conferring entity status on a union contained in G. L. c. 180, § 1 et seq., and thus argues from this in favor of result opposite to that we have reached. We believe the arguments cut the other way. It is difficult to believe that in enacting c. 150E the Legislature meant the efficacy of the remedy to be dependent on whether a union decided to incorporate under the chapter.