### OAKHAM SAND & GRAVEL CORPORATION vs. TOWN OF OAKHAM & another[1] (and a companion case[2]).

Nos. 99-P-655 & 99-P-2067.

Suffolk. May 15, 2001. - February 28, 2002.

Present: JACOBS, DUFFLY, & CYPHER, JJ.

*Zoning,* Nonconforming use or structure. *Contempt. Practice, Civil,* Contempt.

Where evidence demonstrated that the plaintiff, a new operator of a preexisting sand and gravel removal business located in the town of Oakham, increased production of and traffic to the business by thirtyfold, increased the use of heavy equipment, and expanded the area and periods of operations, a Land Court judge properly concluded that the plaintiff's operations constituted an unlawful substantial expansion of a preexisting nonconforming use and were subject to the special permit requirement of the defendant town's zoning by-law. [84-85]

A judgment and order of the Land Court, which ordered a plaintiff to cease and desist from removing more than 1,500 cubic yards of sand and gravel from its locus annually, was sufficiently clear and unequivocal so as to support an adjudication of civil contempt when the plaintiff later disregarded the order. [86-87]

CIVIL ACTION commenced in the Land Court Department on March 28, 1997.

The case was heard by *Leon J. Lombardi,* J., and a complaint for contempt, filed on April 14, 1999, was heard by him.

*Gary S. Brackett* for the plaintiff.

*Barry A. Bachrach* for the defendant.

CYPHER, J. Oakham Sand and Gravel Corporation (OS&G) appeals from (1) a judgment of the Land Court affirming a decision of the zoning board of appeals of Oakham (board) uphold-

---

[1] Zoning Board of Appeals of Oakham.

[2] The companion case is between the same parties. Oakham Sand and Gravel Corporation's appeal from the March 8, 1999, judgment (99-P-655) was briefed separately from its appeal of the judgment of contempt (99-P-2067), and the appeals were consolidated for oral argument and disposition.

ing the zoning enforcement officer's determination that OS&G's use of its land was in violation of the local zoning by-law, and (2) a judgment holding OS&G in contempt. We conclude that the Land Court judge correctly determined that OS&G impermissibly expanded its nonconforming use and that the judgment and order of the court were clear and unequivocal.

1. *Factual background.* OS&G operates a sand and gravel removal business on a parcel of land consisting of approximately 108 acres on Old Turnpike Road in Oakham (locus). Since 1961, various owners have removed sand and gravel from the locus. Prior to 1985, approximately 1,500 cubic yards of material were removed from the locus annually, on a seasonal basis. The operation during this period was primarily conducted on four acres, although six additional acres were used to a lesser degree. From 1977 through 1991, the locus was owned by a company operated by two brothers who were the company's only employees. The brothers used the locus as a sand and gravel pit until 1984, using equipment that included two six-wheel trucks, a nonmechanized screen, and a small front-end loader.

In 1989, the town amended its zoning by-law (1989 amendment) to require a special permit for removal of soil in amounts exceeding 1,500 cubic yards per year. The locus was sold in 1992, and an access road was widened and paved to accommodate vehicles as large as eighteen-wheel trucks.

OS&G acquired the locus through a subsequent sale in 1994. In 1995 and 1996, OS&G mined and sold between 50,000 and 100,000 cubic yards of sand and gravel annually. By 1996, OS&G operated its business on a year-round basis and, as of the trial date, actively used twenty-five acres for the removal operation. OS&G used equipment that included two front-end loaders, a tracked excavator, a bulldozer, and a mechanized screening plant. In 1996, OS&G brought in a mobile office trailer to provide office space.

Since 1989, approximately twenty new homes have been built within one mile of the locus. The police department has received complaints about truck noise, mud on roadways, and the size of the trucks traveling on streets near the locus.

2. *Procedural background.* After OS&G had been informally

and repeatedly notified that its operation was a violation of the zoning by-law, the zoning enforcement officer posted a cease and desist order on the locus in March, 1997.[3] OS&G appealed the order to the board pursuant to G. L. c. 40A, §§ 8, 15. The board upheld the order.[4] In its decision the board explained that the zoning enforcement officer's order was a "warning stating a perceived violation of a by-law by the Enforcement Officer."

OS&G brought an action in the Land Court pursuant to G. L. c. 231A and G. L. c. 240, § 14A, seeking a declaration that its current use was a protected exercise of a nonconforming use under G. L. c. 40A, § 6, not subject to the special permit requirement. OS&G also appealed under G. L. c. 40A, § 17, from the board's decision upholding the cease and desist order. The town filed a counterclaim pursuant to G. L. c. 231A, §§ 1 et seq., and G. L. c. 240, § 14A, seeking a declaration that OS&G was subject to the special permit requirement.

The Land Court judge, hearing the matter de novo, *Pendergast* v. *Board of Appeals of Barnstable*, 331 Mass. 555, 558-559 (1954), conducted a two-day trial and ruled on March 8, 1999, that OS&G "cannot continue its current operations at locus without obtaining a special permit from the planning board." The decision was based on the second and third tests of *Bridgewater* v. *Chuckran*, 351 Mass. 20, 23 (1966), and *Powers* v. *Building Inspector of Barnstable*, 363 Mass. 648, 663 (1973).[5] The judge found that the use by OS&G (1) constituted a change in the quality and character, as well as the degree, of the prior

---

[3] The order also stated that it would "remain in effect until you have been granted a special permit."

[4] In its decision dated May 29, 1997, the board stated that the issue before it was "whether or not a special permit is needed." The board concluded that it agreed "with the decision of the Zoning Enforcement Officer in issuing the Cease and Desist Order" and denied OS&G's appeal from the order. Rephrased, the issue before the board was whether OS&G's use of its land was in violation of law because it constituted an expansion of a nonconforming use beyond the protection of G. L. c. 40A, § 6.

[5] The determination of what constitutes a change or substantial extension of a prior nonconforming use is based on a three-part test announced in *Bridgewater* v. *Chuckran*, 351 Mass. at 23, which asks "(1) [w]hether the use reflects the 'nature and purpose' of the use prevailing when the zoning by-law took effect[;] . . . (2) [w]hether there is a difference in the quality or character, as well as the degree, of use[;] . . . [and] (3) [w]hether the current use is 'different in kind in its effect on the neighborhood.' " (Citations omitted.)

nonconforming use, given the increased area of the removal operations, and (2) that the current use is different in kind in its effect on the neighborhood. Accordingly, the judge affirmed the decision of the board and declared that OS&G was subject to the special permit requirements of the amended by-law, but that OS&G might, as matter of right, continue its sand and gravel removal operation within the ten-acre area used by the former (pre-1989) operators, provided that OS&G removed less than 1,500 cubic yards of material from the locus annually.[6]

After the Land Court issued its decision, OS&G, by its own admission, continued its sand and gravel removal operation unabated and removed in excess of 1,500 cubic yards of material from the locus without applying for a special permit from the town.[7] In response, the town filed a complaint for civil contempt on April 14, 1999. In two orders on various motions to clarify the judgment, issued May 12, 1999, and June 21, 1999, the judge stated that his March 8, 1999, ruling compelled OS&G to cease removal operations at once since it had already removed more than 1,500 cubic yards of material during 1999. An evidentiary hearing was conducted on August 26, 1999, and a partial judgment of contempt was entered by the Land Court on September 23, 1999. On November 1, 1999, the Land Court issued a judgment of contempt that restated and incorporated the previous partial judgment of contempt and ordered OS&G to pay the town $25,590 for attorney's fees.

---

[6]The Land Court's March 8, 1999, judgment stated:

"[1] that plaintiff's sand and gravel operation, which removes more than 1,500 cubic yards of material annually from locus as described in the decision, is subject to the soil removal special permit provisions of the Town of Oakham's zoning by-law, as amended in 1989; . . .

"[2] . . . that plaintiffs may, as of right, continue sand and gravel removal operations within the original ten-acre area used by the Jamaras, provided such activities remove less than 1,500 cubic yards of material annually; and . . .

"[3] . . . that the decision of the Oakham Zoning Board of Appeals relative to the instant action, filed with the Oakham Town Clerk on June 9, 1997, is affirmed . . . ."

[7]In one instance, the Land Court judge found that OS&G removed 1,825 cubic yards of material in a single three-day period from June 16 through June 18, 1999.

3. *Substantial extension of nonconforming use.* General Laws c. 40A, § 6 (hereinafter referred to as § 6), provides that a nonconforming use of land, if lawfully created, is exempt from subsequently enacted zoning provisions. "To preserve the protection afforded a preexisting, nonconforming use under . . . § 6, any subsequent use of the property must not constitute a 'change or substantial extension' of the nonconforming use." *Ka-Hur Enterprises, Inc.* v. *Zoning Bd. of Appeals of Provincetown,* 40 Mass. App. Ct. 71, 74 (1996), *S.C.,* 424 Mass. 404 (1997). Once there is a change or substantial extension to a nonconforming use, the resulting use must comply with the current zoning by-laws to avoid becoming an illegal use. Although "[t]he character of a [nonconforming] use does not change solely by reason of an increase in its volume . . . , or because the hours of operation have expanded . . . , or because improved equipment is used," *Selectmen of Blackstone* v. *Tellestone,* 4 Mass. App. Ct. 311, 315 (1976) (citations omitted), a dramatic increase in the intensity of these characteristics can rise to the level of a qualitative change or substantial extension that constitutes an impermissible alteration of the nonconforming use. *Kreger* v. *Public Bldgs. Commr. of Newton,* 353 Mass. 622, 627 (1968) (expansion of retail oil supply business from 200,000 gallons to 1.4 million gallons per month and addition of a wholesale operation constituted essential change in use).

"This court's duty is to accept the trial judge's findings of fact unless they are clearly erroneous." *Tamerlane Realty Trust* v. *Board of Appeals of Provincetown,* 23 Mass. App. Ct. 450, 453 (1987). See Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996). A finding of fact will not be deemed clearly erroneous unless the appellate court "on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Building Inspector of Lancaster* v. *Sanderson,* 372 Mass. 157, 160 (1977). The judge's conclusion that OS&G's current use of the locus constitutes an unlawful expansion of a nonconforming use is supported by subsidiary findings that are, in turn, supported by the evidence. Since the 1989 amendment, the volume of sand and gravel production has increased by greater than thirtyfold and there has been an attendant increase in traffic to and from the locus. Compare *Kreger*

v. *Public Bldgs. Commr. of Newton, supra* at 627; *Powers* v. *Building Inspector of Barnstable,* 363 Mass. at 663.

Furthermore, OS&G increased its use of heavy equipment, more than doubled the area actively used for the sand and gravel removal operations, compare *Cullen* v. *Building Inspector of N. Attleborough,* 353 Mass. 671, 676 (1968), and substantially increased the periods of operation, compare *Donovan Drug Corp.* v. *Board of Appeals of Hingham,* 336 Mass. 1, 4-5 (1957).

In light of these findings, in addition to the findings previously recited, the judge rightly concluded that OS&G had extended its nonconforming use beyond the protection of § 6. Contrast *Powers* v. *Building Inspector of Barnstable,* 363 Mass. at 658-660; *Derby Ref. Co.* v. *Chelsea,* 407 Mass. 703, 714-717 (1990).[8]

We are not persuaded by OS&G's argument that the town's enforcement officer was overreaching by issuing a cease and desist order. When there is a violation of a town's zoning by-law, issuance of a cease and desist order is an acceptable and common enforcement practice among municipal officers charged with enforcing zoning by-laws. See, e.g., *Hall* v. *Zoning Bd. of Appeals of Edgartown,* 28 Mass. App. Ct. 249, 250 (1990); *Burlington Sand & Gravel, Inc.* v. *Harvard,* 31 Mass. App. Ct. 261, 262 (1991).

OS&G argues further that the decision by the board was invalid under G. L. c. 40A, § 15,[9] since some of the board members expressed different reasons for voting as they did. A majority of the board members reached the conclusion that a

---

[8]The judge and the parties correctly acknowledge that a nonconforming use may be enlarged to the extent that the change "could be said to have reasonably evolved" from the nonconforming use. *Cape Resort Hotels, Inc.* v. *Alcoholic Licensing Bd. of Falmouth,* 385 Mass. 205, 226-227 (1982). In light of the amount of expansion here, this is not such a case. There is nothing to prevent OS&G from applying for a special permit or pursuing any other legal remedies that may be available, in order to determine how much expansion beyond the threshold of 1,500 cubic yards of sand and gravel per year might be permissible.

[9]General Laws c. 40A, § 15, fifth par., as amended by St. 1987, c. 498, § 3, states in relevant part: "The board shall cause to be made a detailed record of its proceedings, indicating the vote of each member upon each question . . . and setting forth clearly the reason for its decision and of its official actions . . . ."

special permit is necessary for the current operation because it had been expanded beyond the protection of the law. "[I]t is inconsequential that they came to that conclusion via various routes." *Security Mills Ltd. Partnership* v. *Board of Appeals of Newton*, 413 Mass. 562, 567 (1992).

OS&G's remaining arguments are unsupported by any relevant authority or reasoned argument and we do not consider them. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). Any alleged procedural irregularities at the administrative level were cured by the Land Court judge's de novo review of OS&G's claims. Compare *Meyer* v. *Planning Bd. of Westport*, 29 Mass. App. Ct. 167, 174-175 (1990).

4. *Judgment of contempt.* OS&G claims that the judgment of contempt was invalid because the Land Court's March, 1999, judgment allegedly contained no "clear and unequivocal command," see *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 565 (1997), and because OS&G should be permitted some expansion of its nonconforming use. Regardless of whether OS&G could, without impermissibly extending its nonconforming use, remove some amount of material greater than 1,500 cubic yards of material per year, the Land Court's judgment was clear that (1) OS&G's current level of activity extended far beyond the permissible limits of expansion, and (2) the building inspector's cease and desist order was affirmed. Accordingly, we affirm the judgment of contempt.

To justify an order of contempt, "there must be a 'clear and unequivocal command and an equally clear and undoubted disobedience.' " *Ibid.*, quoting from *Nickerson* v. *Dowd*, 342 Mass. 462, 464 (1961). In paragraph three of the March, 1999, judgment, the Land Court judge stated that the decision of the zoning board of appeals was affirmed. In his order dated June 21, 1999, the judge explained that "[a]lthough defendants did not specifically request the issuance of a permanent injunction, it must be remembered that the [March, 1999] judgment affirmed the action of the zoning board which upheld the cease and desist order of the Oakham building inspector." The judge characterized his March order as being one of injunctive relief.

Findings of contempt have been upheld "where an order, although subject to some legal interpretation, has nonetheless

provided sufficient notice to the party bound by the order that its actions could form the basis for contempt." *Judge Rotenberg Educ. Center, Inc.* v. *Commissioner of the Dept. of Mental Retardation (No. 1)*, 424 Mass. 430, 448 (1997). See *Labor Relations Commn.* v. *Boston Teachers Union, Local 66*, 374 Mass. 79, 89 (1977) (contempt appropriate where plain meaning of terms put defendants on notice that certain acts would be basis for contempt); *Allen* v. *School Comm. of Boston*, 400 Mass. 193, 194 (1987) (contempt proper where defendant had no reasonable basis to doubt meaning of order).

Any viable argument that the language in paragraph three of the March 8 order did not constitute a sufficiently clear and unequivocal command ended on June 21, 1999, when the judge clarified the March judgment and order. Compare *Commonwealth* v. *Dodge*, 428 Mass. 860, 863 (1999) (any lack of clarity in order which was basis of contempt was dispelled at later hearing). Furthermore, only where the court lacks jurisdiction to make an order or where an order is transparently invalid on its face may a party ignore a court order and attempt to evade sanctions by litigating the validity of the underlying order. *Matter of Providence Journal Co.*, 820 F.2d 1342, 1347 (1st Cir. 1986), modified on reh'g, 820 F.2d 1354 (1st Cir. 1987). See *Vakalis* v. *Shawmut Corp.*, 925 F.2d 34, 36-37 (1st Cir. 1991). Compare *Commonwealth* v. *Dodge*, 428 Mass. at 861 (criminal contempt decrees aimed at vindicating authority and dignity of the court will survive the reversal of an erroneous decree that was disobeyed).

In light of the plain language of paragraph three of the Land Court's March, 1999, judgment and order, the judge's subsequent explanation of that order, and OS&G's admission that it continued to remove far more sand and gravel than allowed under the preexisting nonconforming use, it is difficult to conclude that OS&G did not understand the order of the Land Court to mean that OS&G must cease and desist from removing more than 1,500 cubic yards of sand and gravel from the locus annually. See *Labor Relations Commn.* v. *Boston Teachers Union, Local 66*, 374 Mass. at 82, 91 (upholding contempt orders for violation of order to "cease and desist from encouraging or condoning [a] threatened strike").

*5. Conclusion.* The March 8, 1999, judgment and the judgment of contempt are affirmed.

*So ordered.*