CHARLES A. POWERS & others vs. BUILDING INSPECTOR OF
BARNSTABLE.

Barnstable.   October 6, 1972. — May 17, 1973.

Present: TAURO, C.J., QUIRICO, BRAUCHER, & KAPLAN, JJ.

Zoning, Nonconforming use of structure.  Laches.

Review of cases dealing with nonconforming uses under zoning or-
dinances or by-laws. [651–658]
On a petition for a writ of mandamus to compel the building inspector
of a town to enforce its zoning by-law and so to prohibit alleged
unauthorized use being made of two parcels of land, a refusal of
the trial judge to issue the writ as to one parcel was proper where
its use as a candle factory and store was but a continuation, al-
though to a greater degree, of a use prevailing at the time of
adoption of the zoning by-law, and the issuance of the writ as to
the second parcel was proper as to a building which since the pas-
sage of the zoning by-law had been converted from primarily "dead"
storage to active merchandise processing, but should be modified as
to another building to reflect that while the use of the second
floor for administrative offices did not constitute a continuation of
a nonconforming use, the use of the first floor for miscellaneous
storage was valid. [658–663, 664–665]

PETITION for a writ of mandamus filed in the Superior
Court on June 21, 1968.

The case was heard by Bennett, J.

C. Michael Sheridan (John P. Garrahan with him) for
the petitioners; Harold L. Hayes, Jr., for the interveners
Ann Stevens Atlee & others, also with him.

Stephen C. Jones for the interveners Old Harbor Can-
dle Company & others.

QUIRICO, J.   This is a petition for a writ of mandamus
to compel the respondent building inspector to enforce
the zoning by-law of the town of Barnstable and thereby
to prohibit the alleged unauthorized use being made of
two parcels of land, with buildings thereon, located on
Scudder Avenue in the Hyannisport district of the town.

The petition was originally brought by nine persons owning land located adjacent to or in the vicinity of the two parcels in question. Later twenty-seven additional persons owning property in the same vicinity were allowed to intervene as parties petitioner. All thirty-six of these persons will be referred to collectively as the petitioners.

The owners of the two parcels in question are Marvin Blank and Harold Perkins, Trustees of Old Harbor Realty Trust (Realty Trust), and the lessee of both parcels is the Old Harbor Candle Co. (Candle Co.). Both the Realty Trust and the Candle Co. were allowed to intervene.

After a hearing on the petition the judge filed a document entitled "Findings, Rulings, and Judgment," which concluded with an order that judgment enter (a) denying the petition as to the parcel on which there was a building used for the manufacture and sale of candles (herein referred to as "Parcel 1") and (b) for issuance of the writ as to the other lot on which two buildings described as the Warehouse and the Schoolhouse were located (herein referred to as "Parcel 2").[1]

The case is now before us on the appeals of thirty-four petitioners, the Realty Trust and the Candle Co. from the judge's "Findings, Rulings, and Judgment." (G. L. c. 213, § 1D ,inserted by St. 1943, c. 374, § 4, as amended by St. 1957, c. 155.) The building inspector did not appeal, and no brief was filed by him or in his behalf in this court.

General Laws c. 213, § 1D, as amended, provides that

---

[1] As to Parcel 2 the order provided that "issuance of writ to be stayed, however, for such length of time not exceeding ninety days from entry hereof as may be necessary for application to the Zoning Board of Appeals for such relief as such Board may see fit to grant." The order was entered on August 28, 1968. On January 15, 1969, the Realty Trust applied to the Board of Appeals for a permit authorizing them to use Parcel 2 for the purposes which the judge had held were not authorized by the zoning by-law. The board denied the petition on July 8, 1969. On motion of the petitioners the judge, on June 22, 1971, ordered the board's decision incorporated in the exhibits to be filed with this court. There is no appeal from the board's decision before us.

an appeal from an order of the Superior Court decisive of the issues on a petition for a writ of mandamus shall be governed by the statutes applicable to appeals in equity. It provides further that "[u]pon such appeal all questions, whether of fact, of law or of discretion, which were open at the hearing before . . . the superior court . . . shall be open to the same extent as before such . . . court." The evidence is reported. It includes certain photographic and documentary exhibits but consists in large part of oral testimony. The judge found facts and reported them at the request of the Realty Trust and the Candle Co. G. L. c. 214, § 23, as appearing in St. 1947, c. 365, § 2. "We are bound to examine the evidence. The findings of fact made by the trial judge, however, including inferences of fact when dependent upon credibility, are to stand unless plainly wrong." *Chartrand* v. *Registrar of Motor Vehicles*, 347 Mass. 470, 473. *Crawford* v. *Building Inspector of Barnstable*, 356 Mass. 174, 175. *Ouellette* v. *Building Inspector of Quincy*, 362 Mass. 272, 273.

A brief summary of certain facts common to both parcels of land in question will be helpful in presenting the legal issues raised by these appeals. The town adopted its first zoning by-law in 1949 and thereby placed both parcels in a Residence A district. A major revision of the by-law in 1956 changed the classification of both parcels to a Residence C district. Both the 1949 and 1956 by-laws included the provision that any lawful building or lawful use of a building or premises or part thereof existing at the time the by-law was adopted might be continued, although such building or use did not conform to the provisions hereof. This saving clause for nonconforming buildings and uses was in accord with the statutory provision (G. L. c. 40, § 26, as appearing in St. 1933, c. 269, § 1, and as amended by St. 1952, c. 438, all repealed by St. 1954, c. 368, § 1, and superseded by G. L. c. 40A, § 5, inserted by St. 1954, c. 368, § 2) that a zoning "ordinance or by-law or any amendment thereof shall not apply to existing buildings or structures, nor

to the existing use of any building or structure, or of land to the extent to which it is used at the time of adoption of the ordinance or by-law, but it shall apply to any change of use thereof and to any alteration of a building or structure when the same would amount to reconstruction, extension or structural change, and to any alteration of a building or structure to provide for its use for a purpose or in a manner substantially different from the use to which it was put before alteration, or for its use for the same purpose to a substantially greater extent."

The uses made of the two parcels by the present occupant, the Candle Co., and by its predecessor occupants at times material to the decision of this case will be discussed in more detail later in this opinion. It is sufficient at this point to state that none of the uses being made of the two parcels and the buildings thereon when this case was started and which are continuing were included in the various uses expressly permitted in residential districts under either the 1949 original zoning by-law or the 1956 revision thereof which is still in effect. Nevertheless, the Realty Trust and the Candle Co. contend that the present uses are lawful because they come within the protection of the statutory and by-law provisions excluding from the application of the by-law any lawful nonconforming uses existing when the by-law was adopted or amended.[2]

The first statute enabling cities and towns of this Commonwealth to adopt zoning ordinances or by-laws was St. 1920, c. 601 (see now G. L. c. 40A), and § 7 of that statute provided that "[t]his act shall not apply to exist-

[2] Ordinarily this claim of justification would require a determination of the nature and extent of any lawful nonconforming use in existence when the zoning by-law was first adopted in 1949, but for reasons not entirely clear from the record the judge and most of the parties seem to have concentrated on the situation existing at the time of the comprehensive by-law revision in 1956. The judge stated in his written decision: "It was stated in open court by counsel for the petitioners that no evidence relating to the years before 1957 was offered or claimed to show any violation of Zoning By-laws and, therefore, the Court confines itself to a consideration of the violations, if any, of the Zoning By-laws as adopted and applicable to the whole town after 1956."

ing structures nor to the existing use of any building, but it shall apply to any alteration of a building to provide for its use for a purpose, or in a manner, substantially different from the use to which it was put before the alteration." All of the zoning enabling statutes since that time have included a provision in substantially the same language protecting the right to continue nonconforming uses. G. L. c. 40, § 26, repealed by St. 1954, c. 368, § 1, and superseded by G. L. c. 40A, § 5, inserted by St. 1954, c. 368, § 2.

During this period of more than a half century in which municipalities have been permitted to adopt zoning ordinances and by-laws, this court has been required to decide a large number of cases involving the question whether a use being made of premises which was not expressly authorized under the applicable zoning ordinance or by-law was nevertheless protected as a lawful nonconforming use. Each case involved and required a determination and consideration of the facts of the particular case measured against the language of the statute and ordinance or by-law and, ultimately, a decision that there was or was not a protected nonconforming use. By this process there has developed a body of case law which gives guidance and suggests tests to be applied in deciding such cases. A review of some of these decided cases may be helpful.

*Cochran* v. *Roemer*, 287 Mass. 500, 507–508, is one of the first to suggest a test to be applied. That test was whether the use under attack was "different in kind" from the nonconforming use in existence when the zoning ordinance was adopted. We said, at 508, that it "is not different in kind . . . simply because it is bigger." [3] In

---

[3] This language should be considered subject to the following cautions about the zoning statutes peculiar to Boston which were involved in *Cochran* v. *Roemer, supra.* In *Inspector of Bldgs. of Burlington* v. *Murphy*, 320 Mass. 207, at 209, we said: "But that case was decided under the zoning statutes applicable to the city of Boston, which have always been more liberal toward nonconforming uses than the general statutes applicable elsewhere." This caution was repeated in *Seekonk* v. *Anthony*, 339 Mass. 49, 54, and in *Kreger* v. *Public Bldgs. Commr. of Newton*, 353 Mass. 622, 626.

*Building Commr. of Medford* v. *McGrath*, 312 Mass. 461, at 462, we said that "a nonconforming use of the same premises may be not only continued but also increased in volume." In *Medford* v. *Marinucci Bros. & Co. Inc.* 344 Mass. 50, at 60, we said: "The distinction is between an increase in the amount of business, even a great increase, which does not work a change in use, and an enlargement of a nonconforming business so as to be different in kind in its effect on the neighborhood." Finally, in *Bridgewater* v. *Chuckran*, 351 Mass. 20, we said, at 23: "Recent cases have emphasized three tests for determining whether current use of property fits within the exemption granted to nonconforming uses. (1) Whether the use reflects the 'nature and purpose' of the use prevailing when the zoning by-law took effect. . . . [citations omitted.] (2) Whether there is a difference in the quality or character, as well as the degree, of use. . . . [citations omitted.] (3) Whether the current use is 'different in kind in its effect on the neighborhood.' " . . . [citation omitted.]

It is inevitable that the development and application of a rule of law governing nonconforming uses on a case by case basis, with the result depending almost entirely on the particular facts of each case, should produce two separate and distinct lines of cases, one holding that the disputed use, often despite some changes therein after the adoption or amendment of the zoning ordinance or by-law, is protected as a lawful nonconforming use, and the other holding that the use, although lawful when the zoning ordinance or by-law was adopted or amended, has so changed that it is no longer protected. The following are some of our decisions most frequently cited for each conclusion.

(a) *Cases Upholding the Nonconforming Use.* In *Cochran* v. *Roemer*, 287 Mass. 500, 507–508, a small fuel business "conducted by an old system . . . at retail with comparatively few sales to other dealers," was changed to "a very large business [conducted] by the most modern appliances for the most part by sales to the ultimate con-

sumer but to a considerable extent to other dealers for resale." In *Medford* v. *Marinucci Bros. & Co. Inc.* 344 Mass. 50, 51–53, the disputed use consisted of the laying of a new fifty-car side track parallel to a railroad's existing and allegedly nonconforming tracks, and the use of the siding for the unloading of large quantities of fill transported from New Hampshire for use in highway construction in this Commonwealth. In *Morin* v. *Board of Appeals of Leominster*, 352 Mass. 620, a nonconforming one-man printing business was conducted in a barn during the summer months and moved into a dwelling house on the same lot during the winter months. The use of the barn for the nonconforming printing business the year round, after insulation and interior improvements of the building, was upheld. In *Crawford* v. *Building Inspector of Barnstable*, 356 Mass. 174, we held a part of a disputed use lawful and a part unlawful. We upheld the alteration of a nonconforming small hotel building by enclosing an open porch thereby increasing the ground floor area of the building by no more than three to four per cent. The use held unlawful is described below. In *McAleer* v. *Board of Appeals of Barnstable*, 361 Mass. 317, 322–324, we held that a lawful nonconforming use of property in a "Residence" district for the operation of an inn during the summer months permitted the inn to be operated during the entire year.

(b) *Cases Limiting the Nonconforming Use.* In *Lexington* v. *Bean*, 272 Mass. 547, 553, we held that the use of a building by the defendant "for the commercial purpose of repairing motor vehicles for hire is 'substantially different' from a use of it by a person residing on the premises for the purpose of repairing motor vehicles belonging to him as incidental to his trucking and express business." In *Marblehead* v. *Rosenthal*, 316 Mass. 124, we held that a lawful nonconforming use consisting of the operation, on a small scale, of the business of a tailor and furrier in one store, with some hand sponging and cleaning of clothes by the members of a family and two employees, did not permit its change and expansion to

three stores with complete mechanical equipment for a dry cleaning establishment employing sixteen or seventeen people, only one of whom was a tailor. In *Everpure Ice Mfg. Co. Inc.* v. *Board of Appeals of Lawrence*, 324 Mass. 433, we held that a fuel oil business was not so intrinsically and inherently related to an existing nonconforming ice manufacturing business as to be fairly construed as included within the latter use. *Lynn* v. *Deam*, 324 Mass. 607, involved a change in the use of a building from a dance hall to a restaurant or store in which food was served or sold. *Seekonk* v. *Anthony*, 339 Mass. 49, involved a change from "a makeshift set of arrangements for furnishing to dump trucks in one place all the ingredients of concrete" to "a modern plant using more elaborate fixed facilities for use in connection with more complicated vehicles . . . [and to] a substantial supply terminal for cement mixer trucks." We held this to be more than "a permitted increase in the volume of business done in an existing plant," and that it amounted to a "change in and enlargement of the plant which made it 'different in kind in its effect upon the neighborhood.'" *Hinves* v. *Commissioner of Pub. Works of Fall River*, 342 Mass. 54, involved the attempted enlargement of a nonconforming grocery store business by the addition of a commercial catering service involving the cooking of food. In *Massachusetts Broken Stone Co.* v. *Weston*, 346 Mass. 657, where the nonconforming use included the sale of crushed stone produced entirely from a quarry on the premises, we held, at 662–663, "that the importation of stone to be processed and sold on the premises as stone would be a change in use, and the petitioner has no right thereto." In *Brady* v. *Board of Appeals of Westport*, 348 Mass. 515, we held that a nonconforming use consisting of four or five boats associated with the premises moored or tied to a twelve foot pier could not be changed to a new structure consisting of two piers, one extending out into the water a distance of eighty feet and the other a distance of ninety feet, a barge measuring twenty-eight by ninety feet in size permanently affixed to

the shore, and commercial boat repair and service facilities. In *Building Inspector of Malden* v. *Werlin Realty, Inc.* 349 Mass. 623, we held that the use of premises for the manufacture and incidental storage of oxygen could not be justified on the basis of a prior lawful nonconforming use of the premises for the storage of ice cream cones and straws. In *Bridgewater* v. *Chuckran,* 351 Mass. 20, we held that the use of premises as a ready mixed concrete manufactory and center for supply to others could not be justified on the basis of the prior lawful nonconforming use of the premises as a house builder's main yard in which the mixing of concrete was merely incidental to his general business. In *Kreger* v. *Public Bldgs. Commr. of Newton,* 353 Mass. 622, there was a lawful nonconforming use of premises by the Luther Paul Co. (Paul) for the storage and sale of fuel oil and service to consumer customers. The use involved three fuel storage tanks having a total effective capacity of 56,000 gallons and an average monthly sale of less than 200,000 gallons. Paul then made an arrangement with another company, Northeast Petroleum Company (Northeast) which sold fuel oil to a number of retail distributors whereby Northeast would supply oil at Paul's tanks for delivery to the tank trucks of Paul and of Northeast's customers. Without increasing the tank storage capacity, the total monthly distribution from Paul's tanks increased six or seven times to as much as 1.4 million gallons in one month, thus increasing the frequency with which the tanks had to be refilled. Almost ninety per cent of the oil distributed from the tanks thereafter was to Northeast's customers. We held, at 627: "For zoning purposes, there was a change in the kind of use. . . . The new wholesale use predominates. . . . We need not decide whether every addition to a retail operation of some wholesale business would overload a nonconforming or other legal use. Here the businesses are different in an aspect with which the use regulations in the zoning ordinance are directly concerned, and there has resulted a significant increase in use. . . . It is beside the point

that under our many cases this [increase in volume of business] would have been protected had it resulted merely from the growth of Paul's retail business without expansion of plant. The increased activity with the change to a wholesale business shows that the change has been substantive." *Cullen* v. *Building Inspector of No. Attleborough,* 353 Mass. 671, 676, involved an increase in milk production coupled with a tenfold increase in the dairy herd and other "extensive activities" which we held "compel the conclusion that there was a change" and that "[f]or purposes of the zoning laws the aggregate of all these operations amounts to a difference in quality rather than in degree alone." In *Jasper* v. *Michael A. Dolan, Inc.* 355 Mass. 17, at 24, we said: "The present case involves the addition of a product (hard liquor) sold by a store previously licensed to sell only beer and wine. We are of opinion that this addition does not satisfy the first and second tests laid down in *Bridgewater* v. *Chuckran* . . . [351 Mass. 20, 23]. In other words, the sale of hard liquor (1) does not reflect the nature and purpose of the preëxisting nonconforming use and (2) differs in the quality or character, as well as the degree, from the prior use. . . . Similarly, the operation of a separately conducted all-alcoholic package store is substantially different from the sale of beer and wine in connection with a food store. Accordingly we hold that the sale of all-alcoholic beverages at the . . . premises constitutes a new use and is in violation of the zoning ordinance." In *Crawford* v. *Building Inspector of Barnstable,* 356 Mass. 174, the owners of a small hotel or club had a lawful nonconforming use which included the beaching or mooring of boats in the bay on which the hotel property fronted. They then built a pier eight feet wide extending out into the water a distance of 285 feet, with a deck fifteen by forty-eight feet in size forming a "T" at the outer end of the pier. The pier was for commercial, not residential purposes. In rejecting the contention that the pier was a lawful continuation of the nonconforming use, we said, at 179–180: "The pier . . . makes a use of the water side

of the premises which is different in quality, character and kind as well as degree from that which was made of it before." [4]

Having noted the principal cases comprising the two lines of decisions on the status of nonconforming uses, particularly with reference to changes or extension in such uses after the adoption of zoning regulations, we must apply the results of those decisions to this case. We shall do so separately as to each of the two parcels of land and the three buildings.

1. *Parcel 1.* This is the parcel on which the building presently used for the manufacture and sale of candles and other merchandise is located. The building, having one story and a basement, has been in existence in its present location and size since an undetermined date, but prior to 1950. The individuals who formerly owned this parcel (the Johnson family), and the Candle Co. which they caused to be formed in 1946, used most of the first floor of the building for the manufacture and sale, at wholesale and retail, of candles and accessories, and used a small "L" at the front of the building as the administrative office for that business. They used part of the basement for storage and rented part of it out to others for storage. These uses continued to 1954.

In 1954 a new group of persons (the Stein family) became stockholders of the Candle Co. The Candle Co. continued to use the building for the same general purposes as before 1954 except for a substantial increase in

---

[4] There are additional cases limiting the extension of nonconforming uses which are frequently cited but which have no application to the present case because they involve removal of loam or gravel for sale, or other earth removal operations. See *Burlington* v. *Dunn,* 318 Mass. 216; *Billerica* v. *Quinn,* 320 Mass. 687; *Wayland* v. *Lee,* 325 Mass. 637. Other cases, frequently cited but not applicable here, hold that the existence of a lawful nonconforming use does not permit the erection of additional buildings for the extension or enlargement of that use. See *Wilbur* v. *Newton,* 302 Mass. 38, 43; *Inspector of Bldgs. of Burlington* v. *Murphy,* 320 Mass. 207, 210; *Connors* v. *Burlington,* 325 Mass. 494; *Planning Bd. of Reading* v. *Board of Appeals of Reading,* 333 Mass. 657; *Chilson* v. *Zoning Bd. of Appeal of Attleboro,* 344 Mass. 406; *Garfield* v. *Board of Appeals of Rockport,* 356 Mass. 37. See also *Simeone Stone Corp.* v. *Board of Appeals of Bourne,* 345 Mass. 188, 192–193.

the volume of the business which was conducted on or from the premises. The Stein family added to the line of merchandise other than candles. They increased the number of wholesale accounts, thus increasing the volume of candles manufactured on the premises and the volume of merchandise purchased for resale, and they also increased the volume of merchandise shipped out to wholesalers both by parcel post and by truck. The candle manufacturing operations occasionally extended beyond the daylight hours into the evening. The retail sale business was operated on the premises from the spring to early December of each year, and in the summer months it was operated seven days a week from morning until nine or ten in the evening.

In 1957 the Realty Trust purchased Parcel 1, and the interveners Blank and Perkins became the sole stockholders and officers of the Candle Co. Under their management the Candle Co. increased the variety of the merchandise which it sold both at wholesale and retail, adding a variety of "gift shop" and other noncandle related items. It also sold at wholesale a greater variety of candles not of its own manufacture. There has been a large increase in traffic on the street where the Candle Co. is located and in the number of persons stopping at its retail store which is now open seven days a week throughout the year. Although the Company provides forty offstreet parking places, the number is not adequate on certain occasions. Commercial buses bring groups to the store and occasionally the buses park there with their motors running for more than a half hour.

The Realty Trust purchased Parcel 2 in 1962. Thereafter two types of activity were moved out of the building on Parcel 1. The administrative office for the business was moved from the "L" of that building to the second floor of the Schoolhouse building on Parcel 2, and the shipping of merchandise to wholesale customers was moved to the Warehouse building on Parcel 2.

The judge found that the present use being made of Parcel 1 and the building thereon "represents a continua-

tion of the use prevailing at the time of adoption of the
. . . [zoning] By-Law; that . . . such use was lawful
at the time of said adoption; [and] that there is a differ-
ence in degree of such use, but not in the quality or char-
acter thereof." We agree with those conclusions. There
was no error in that part of the order which denied a writ
of mandamus as to Parcel 1.

2. *Parcel 2.* There are two buildings located on this
parcel, one being identified as the "Schoolhouse" and the
other as the "Warehouse." This parcel was owned by
members of a family named Phinney from at least 1912
until 1962 when it was sold to the Realty Trust. On the
latter date there was a third small wooden building, com-
monly called the "Shack" located on the parcel but it has
since been torn down and is not involved in this decision.
The relevant descriptions and uses of the Schoolhouse
and the Warehouse follow.

(a) *The Schoolhouse.* This is a two-story wooden
building resembling a dwelling house. During the 1950's
the first floor was used for miscellaneous storage in con-
nection with a business conducted by the Phinney family
in the Warehouse; and this floor is still used for miscel-
laneous storage.

From 1953 to 1959, and perhaps during other years in
the 1950's, the second floor was occupied as living quar-
ters by two employees of the Candle Co. These two per-
sons also engaged in what is sometimes referred to as
"Home industry" in their living quarters, using their
spare time to make costume jewelry, rubber stamps and
wooden foot stools and to do printing of business cards
and notices on a three inch by five inch press. There is
no evidence which would permit a finding of the volume
of the production of this "Home industry."

Sometime after the Realty Trust purchased Parcel 2,
the second floor of the Schoolhouse was converted into
administrative offices of the Candle Co. business, and
now contains a variety of office and business equipment.
It is no longer used as a residence by anyone. There is
no evidence or finding by the judge of any prior use of the

second floor which can serve as the basis for a claim that the present use is permitted as the continuation of a lawful nonconforming use.

We hold with reference to the Schoolhouse building (a) that the present use of the first floor thereof for miscellaneous storage is lawful as a continuation of a nonconforming use; and (b) that the present use of the second floor thereof for the administrative office of the business conducted by the Candle Co. is not entitled to any protection as a nonconforming use and it violates the zoning by-law of the town.

(b) *The Warehouse.* The Warehouse is a corrugated metal building of one story, sixty feet by one hundred feet in size, erected in 1912. It was thereafter used by members of the Phinney family for a variety of purposes including the following: the storage and packaging of coal and wood for sale and delivery to customers, the storage of ice boxes (not electric refrigerators) for sale, the storage of coal trucks, oil trucks, pumps and drums used in a retail fuel oil business, the winter storage of fishing and marine paraphernalia, the rental of space for the storage of vehicles, including trucks, and the storage of second-hand furniture. Some aspects of the coal and fuel oil business were conducted in portions of the Warehouse from about 1920 until the Phinney family sold this business in 1959. The furniture storage occurred in about 1960 and lasted for about two years. The storage of ice boxes occurred between 1930 and 1950. The storage of fishing gear occurred during the winters from about 1938 or 1939 until 1959. The evidence does not permit a finding of more exact dates for the several uses of the Warehouse than those given above. Neither does it permit more detailed findings of the extent to which the Warehouse was used for the several purposes described above or the areas or parts of that building used therefor.

After the Warehouse was purchased by the Realty Trust in 1962, it was used increasingly by the Candle Co. as a place for receiving, storing, packaging and ship-

ping items involved in the wholesale aspect of its business. The Candle Co. in effect moved that part of its total business operations from its former location in the building on Parcel 1 to the Warehouse building on Parcel 2. To adapt the Warehouse for this move, a new floor, two toilets, heating and lighting equipment, shelving, bins and shipping doors were installed, and later the building was also insulated and sheathed.

The Candle Co.'s gross sales for the year 1960 were $111,027, and they increased each year thereafter. Its use of the Warehouse after 1962 permitted the expansion of its wholesale operations. At the time of trial of this case in 1968 the Candle Co. had fifty-two employees. Its gross sales for 1967 amounted to $569,512, consisting of $57,740 received from sales "made on the premises," and $511,772 received from sales "made off the premises." All of the merchandise sold "off the premises" was processed in the Warehouse. This included the receiving, sorting, checking, placing in stock or taking from stock, counting, wrapping, packaging, labeling, boxing and addressing of merchandise for shipment to about 4,000 to 5,000 customers throughout the country. The merchandise was delivered to and shipped from the Warehouse principally by trucks or trailer trucks. In 1968 an average of three or four trucks or trailer trucks drove to and from the premises each day for this purpose. No manufacturing or retail sales operations have been conducted at the Warehouse.

The judge found and ruled "that the current use of . . . [the Warehouse] is different in quality and character from that use prevailing before 1957, the difference being that what was a warehouse and distribution facility used for the purpose of serving customers within physical reach of one day delivery by truck is now such a facility for serving customers nationwide." We reach the same result but not for the sole reason stated by the judge.

We hold that the present use of the Warehouse is barred as an alleged nonconforming use when tested by

the standards suggested by our opinion in *Bridgewater* v. *Chuckran,* 351 Mass. 20, 23. The first test is whether the present use reflects the nature and use prevailing when the zoning by-law took effect. We hold that it does not. The second test is whether there is a difference in the quality or character, as well as the degree, of the present use. We hold that there is. The third test is whether the current use is different in kind in its effect on the neighborhood. There is no question that the combined use of the two parcels and the three buildings for the conduct of a single business enterprise is different in kind in its effect on the neighborhood by reason of the increased traffic. However, it is difficult to determine to what extent this is attributable to the use of Parcel 2, except for the effect of the truck and trailer-truck deliveries and shipments.

Our decision that the present use of the Warehouse is not a protected nonconforming use is based on a consideration of the combined effect of all of the differences between that use and the use which existed at the time of the 1956 amendment to the zoning by-law, and it is not limited to the narrow ground stated by the judge, viz., that the area to which merchandise is distributed from the Warehouse is now much larger than that serviced in 1956. The Warehouse building which formerly housed a rather dormant operation involving primarily what might be termed "dead" storage has now become a veritable beehive of activity essential to the operation of the Candle Co.'s wholesale business described above. What the Phinney family did in the Warehouse prior to the time the property became classified for residential purposes by the zoning by-law cannot and does not authorize or protect the use now being made of that building by the Candle Co. Of the many cases previously decided by this court on this subject and which are listed above, those involving facts which more nearly resemble those of the present case are *Marblehead* v. *Rosenthal,* 316 Mass. 124, and *Kreger* v. *Public Bldgs. Commr. of Newton,* 353 Mass. 622, but we do not rely solely on these two cases.

3. *Advertising Signs.* The permissibility of four signs advertising the business of the Candle Co. was put in issue in the trial in the Superior Court, and the judge made findings and rulings thereon. Two of the signs were located on Parcel 1, and the other two were directional signs maintained on premises other than Parcels 1 and 2. None of the briefs includes any discussion or argument on the issue of the permissibility of the signs. We therefore treat this issue as waived by all parties. S.J.C. Rule 1:13, 351 Mass. 738.

4. *Laches.* At the trial in the Superior Court the Realty Trust and the Candle Co. claimed that the petitioners were barred by reason of laches in seeking relief and the judge found against them thereon. While there is an argument against this claim in the brief of the original petitioners, the issue is not argued in the brief of the parties who raised it. They are therefore deemed to have waived it. S.J.C. Rule 1:13, 351 Mass. 738. In any event, for reasons stated in *McAleer* v. *Board of Appeals of Barnstable,* 361 Mass. 317, 322, laches may not be a defence to this type of petition.

5. *Modification of Order for Judgment.* The judge of the Superior Court entered an order for judgment in effect denying the petition for a writ of mandamus as to Parcel 1 and ordering issuance of the writ as to Parcel 2. On the basis of what we have said above, the only change required in that order is that relief should have been denied as to the first floor of the Schoolhouse building on Parcel 2. Accordingly the order for judgment is to be modified in that respect with the result that as modified it will order as follows:

(a) The petition for a writ of mandamus is denied as to Parcel 1, and as to the first floor of the Schoolhouse building on Parcel 2; and

(b) A writ of mandamus shall issue against the building inspector ordering him to take whatever action is required under § Q (5) of the zoning by-law or under any other provision of law for the enforcement of the zoning by-law as to the Warehouse building and the second floor

of the Schoolhouse building, both located on Parcel 2. The order as to these two buildings shall not contain the provision for a stay of the issuance of the writ which was contained in the original order entered in the Superior Court.

*So ordered.*