*307 Neel, J.
Plaintiff Louana H. Evarts appeals, pursuant to G.L.c. 40A, §17, defendant Somerville Planning Board’s approval of defendant Assembly Square Limited Partnership’s application to locate a Home Depot store in part of the existing Assembly Square Mall building. After trial, and for the reasons set forth below, the Court (1) determines that plaintiff has standing to bring the appeal, (2) determines that the Somerville Zoning Ordinance requires a different standard of review of the application than that employed by the Planning Board, and (3) remands the case to the Planning Board for reconsideration in light of this decision.
FINDINGS OF FACT
In view of the rulings and order of remand set forth below, the Court will address at this time only the facts pertaining to the background of the appeal, and to standing. If later proceedings require, the Court will enter findings on the remaining factual issues tried by the parties.
On the basis of the credible evidence at trial, and inferences reasonably drawn therefrom, I find as follows.
I. Background
Plaintiff Louana H. Evarts resides at 230 Fellsway (Route 28), Somerville, Massachusetts.
Defendant Planning Board of the City of Somerville (Board) is the Special Permit Granting Authority (SPGA) for the Business Park Assembly zoning district in Somerville. 1990 Somerville Zoning Ordinance (Ordinance), §6.1.12.
Defendant Assembly Square Limited Partnership (ASLP) is a partnership of Taurus New England Investments Corporation and Gravestar, Inc.
In September 1998, ASLP purchased the Assembly Square Mall (Mall) and the approximately 26-acre parcel of land on which the Mall is located (Mall property). The Mall property lies alongside Route 28 in Somerville in an area sometimes referred to as the Assembly Square District.
The Mall property contains a building of approximately 364,000 square feet (Mall building) and associated parking lot. The Mall property is bounded by Middlesex Avenue on the west, Route 28 and the M.D.C. park on the north, private property within Assembly Square on the east, and Foley Street on the south.
The Mall building currently contains a K-Mart at the south end and a Building 19 at the north end. The middle section, which formerly housed several dozen small retail tenants, is vacant.
ASLP has leased the middle section of the Mall building, and the adjacent parking lot in front of the Mall building, facing into Assembly Square, to Home Depot. The leased parcel totals 10.9 acres of the 26-acre Mall property.
ASLP proposes to demolish the middle section of the Mall building and to build (or to have Home Depot build) a Home Depot store (ASLP proposal).
The Mall was permitted in 1979 and began retail operations shortly thereafter.
Under the Somerville Zoning Ordinance in existence in 1979, the Mall was located in an Industrial A zoning district, in which retail uses were allowed “as of right” irrespective of size.
In 1990, Somerville adopted the current Ordinance. Under the Ordinance, the Mall is situated in the Business Park Assembly district.
Pursuant to the Ordinance, as adopted in 1990, retail uses with over 10,000 square feet of gross floor area are not allowed “as of right” in the Business Park Assembly district. Instead, all retail uses over 10,000 square feet, not otherwise prohibited in a Business Park Assembly district, require a special permit or a special permit with site plan review.
Each of the former tenants in the middle section of the Mall building occupied less than 10,000 square feet. All but two of them occupied less than 5,000 square feet.
Each of the small tenants had a separate Certificate of Use and/or Occupancy for its space.
Under the ASLP proposal, the proposed Home Depot is to be located within the footprint of the existing middle portion of the Mall building, and is to *308 result in a reduction in size of the retail space at the Mall building by some 28,000 square feet, to approximately 336,250 square feet.
In addition, the proposed Home Depot will have a new roof and exterior walls. The foundation of the Mall building is to remain, and K-Mart and Building 19 are to remain at either end of the Mall.
On July 27, 2000, ASLP applied to the Somerville Division of Inspectional Services (ISD) for a building permit for the ASLP proposal.
On September 19, 2000, the Superintendent of ISD denied the application for a building permit. His letter stated that “the proposed Home Depot project is a change or extension of a pre-existing non-conforming retail use at this location.’’ He advised that ASLP “should obtain a special permit/finding from the SPGA pursuant to Section 4.5.3 of the Zoning Ordinance. In the absence of such a finding, you will need to obtain a special permit with, site plan review pursuant to Section 7.11 of the Zoning Ordinance.”
On October 16, 2000, ASLP applied to the Board for a Special Permit/Finding under Section 4.5.3 of the Zoning Ordinance, seeking to alter a preexisting nonconforming retail use.
ASLP’s application included four plans: Site Plan (SP-1), Existing Conditions Plan (C-2), Layout and Materials Plan (C-3) and Exterior Elevations (A3.0.) Those plans were among the ones it previously filed with the building permit application, as ASLP’s counsel informed the Board.
On December 6, 2000, the Board held a public hearing on ASLP’s application. It continued that hearing to December 20, 2000.
On December 20, 2000, the Board voted 4-1 to approve the requested Special Permit/Finding with conditions (the Decision). On December 21, the Board filed the Decision with the Somerville City Clerk.
In the Decision, the Board found, in part, as follows:
5) Proposal: The Applicant is proposing to alter its retail use of the center portion of the mall from numerous small retailers to one large retailer, Home Depot, through selective demolition at the center of the mall building and certain exterior and interior alterations. The existing K-Mart store and other retail uses would continue. A reduction of approximately 28,000 s.f. of retail space would occur as a result of the proposal, with the building occupying approximately 336,250 s.f. Following completion of the proposed work, the building itself would continue to comply with the dimensional requirements of the Somerville Zoning Ordinance. The area would be known as Assembly Square Marketplace.
6) Nature of the Application:. .. Although retail uses were allowed as of right regardless of size or type in 1979, certain retail uses having 10,000 square feet or more of gross floor area now require a special permit with site plan review pursuant to S.Z.O. §7.11 of the Zoning Ordinance. Therefore, the current retail use is a lawfully preexisting nonconforming use.
The proposed alteration of the nonconforming use requires a Special Permit/Finding from the Planning Board as the SPGA, pursuant to S.Z.O. §4.5.3., subject to a determination that the alteration of use is not substantially more detrimental to the neighborhood than the existing nonconforming use.
Under the heading “DecisionSpecial permit to alter or extend a nonconforming use,” the Board found:
. . . that the alteration of use, as conditioned below, would not be substantially more detrimental to the surrounding neighborhood than the existing Assembly Square Mall, the standard set forth for such permits. Specifically:
The proposed renovation and re-tenanting of a portion of the existing retail space for a Home Depot store is an alteration of the lawfully preexisting nonconforming retail use at this site, which has operated as a mall since approximately 1980 . . . The Planning Board, acting as the Special Permit Granting Authority, is granting this permit under S.Z.O.§4.5.3. However, if for any reason this project were to be reviewed under S.Z.O.§4.5.1., the criteria for granting a Special Permit/Finding would be the same, and the Planning Board would make the same findings and conditional approval.
Finally, under the heading “Recommendation to the Zoning Board of Appeals,” the Board voted “to recommend that the Zoning Board of Appeals UPHOLD the ISD Superintendent’s decision to deny the building permit, because the proposed alteration of a preexisting nonconforming use requires a Special Permit/Finding pursuant to S.Z.O. §4.5.3.”
The Ordinance contains the following definitions:
2.2.21. Building. Any structure, either temporary or permanent, having a roof or other covering, and designed or used for the shelter or enclosure of any person, animal or properly of any kind ... The word “building” shall be construed where the context allows as though followed by the words “or parts thereof.”
2.2.104. Nonconforming Use. A use of a structure, building or lot that does not conform to a use regulation prescribed by Article 7 of this Ordinance, provided that such use was in existence and lawful at the time the use regulation became effective.
2.2.149. Special Permit with Site Plan Review. A special approval, similar to a Special Permit, with the added purpose of allowing more thorough review of a project which, due to its size or nature, is likely to have significant impacts upon the district within which it is located or on the City as a whole
2.2.157. Structure. Any constructed, erected or placed material or combination of materials in or *309 upon the ground, including, but not by way of limitation, buildings . . . The word “structure” shall be construed, where the context allows, as though followed by the words “or part thereof.”
2.2.167. Use. The purpose for which land, or a building or structure is arranged, designed or intended, or for which a lot of land, a building or a structure is or may be occupied or maintained.
The Ordinance, at Article 4, “Nonconforming Uses and Structures,” contains the following:
Section 4.1. Purpose.
It is the stated purpose of this Article that nonconforming uses and structures are to be strictly regulated, and that the provisions of this Ordinance will be construed and interpreted in the light most favorable to limiting the continuation and/or expansion of nonconforming uses and structures .. .
Section 4.5.1. Change of Nonconforming Use
Land or buildings lawfully being put to a nonconforming use may change to a use permitted as of right as provided in Article 7. Permission for a new use which would require a special permit or special permit with site plan review can be granted, provided there is compliance with the requirements of Article 5 ... A nonconforming use may be changed to another nonconforming use only by special permit authorized by the SPGA in accordance with the procedures of Article 5, provided that the SPGA finds that such change is not substantially more detrimental to the neighborhood that the existing nonconforming use . . .
Section 4.5.3. Expansion of Nonconforming Uses.
Expansion, alteration, enlargement or extension of a lawfully existing nonconforming use shall be permitted only by the granting of a special permit authorized by the SPGA in accordance with the procedures of Article 5, provided that the SPGA finds that such change is not substantially more detrimental to the neighborhood than the existing degree of nonconformity. In judging detriment, the SPGA may consider, without limitation, impacts upon the following: traffic volumes, traffic congestion, types of traffic, change in traffic patterns and access to the site, adequacy of municipal water supply and sewer capacity, noise, odor, glare, scale, on-street parking, shading, visual effects and neighborhood character.
For the purposes of this Ordinance, a nonconforming use shall be considered to be expanded, altered, enlarged or extended based on the following:
a. An increase in the gross floor area; or
b. An increase in the number of dwelling units; or
c. An increase in the total hours of operation, or increase in hours of operation before 8:00 AM of after 6:00 PM; or
d. A change from seasonal to full-time operation; or
e. A substantial increase in the number of automobiles or truck traffic trips generated by the use.
It is the intent of this Ordinance that the marginal degree of expansion, alteration, enlargement or extension itself comply with all the provisions of this Ordinance.
The Ordinance defines business uses in more detail than did the prior zoning ordinance, and distinguishes among them by size. For example, in the Business Park Assembly District, many retail uses are permitted as of right up to 9,999 square feet, but require a special permit with site plan review for 10,000 square feet or more. Such uses include the following:
a. General merchandise or department store. §7.11.9.2.
b. Store selling books, stationery, flowers, novelties, cards, apparel, fabrics, accessories and the like. §7.11.9.5.
c. Store selling home furnishings and carpets. §7.11.9.7.
d. Store selling hardware, paint, wallpaper, and lawn and garden supplies in an enclosed building. §7.11.9.8.
e. Building and construction materials store in an enclosed building. §7.11.9.9.
f. Commercial nursery in an enclosed building. §7.11.9.10.
g. Sale or rental of home improvement equipment or tools in an enclosed building. §7.11.9.11.
Article 5 of the 1990 Zoning Ordinance sets out the requirements for a special permit with site plan review. For a special permit, the SPGA “shall make findings and determinations” that the development of the site would meet twenty-one separate criteria. Id. §5.2.5. For example, it must make findings on traffic, drainage, functional design, environmental impact, open space, consistency with the purposes of the Ordinance, relation of the buildings to the environment, enhancement of appearance, screening and prevention of adverse impact of the neighborhood. The application must also satisfy the Site Plan Approval standards and criteria.
II. Standing
The Court makes the following findings only for purposes of determining plaintiffs standing, and not for purposes of determining the merits of plaintiffs appeal. Plaintiff has presented credible evidence that:
Plaintiff owns and lives in a condominium' at 230 Fellsway (Route 28). The complex consists of three duplex townhouses, a total of six units.
The two units at the north end have a driveway on Shore Drive. The other four units, including plaintiffs, *310 have a driveway leading toward Route 28; a house to the south has an adjacent, similar driveway. Plaintiffs driveway exits onto a lane (referred to at trial as “Shore Drive extension”) that parallels Route 28 but is separated from it in part by a concrete median. Shore Drive extension merges with Route 28 (South) at a set of traffic lights at Middlesex Avenue (Middlesex Avenue light), though it remains a separate lane at that point. Thus, when plaintiff exits her driveway, she must turn right onto Shore Drive extension and merge onto Route 28 (South).
Traffic leaving the Mall on Middlesex Avenue and turning south onto Route 28 passes through the Middlesex Avenue light. That light is semi-actuated, meaning that the light cycle is automatically adjusted in response to waiting traffic, within certain limits. Thus, more traffic exiting the Mall would, within those limits, keep the light green longer for those vehicles, and red longer for plaintiff and for vehicles driving south on Route 28.
Plaintiff drives to work in Boston in morning rush hour three days a week. She takes 1-93 to get to work, as well as to other destinations. That is the most convenient and safest route that she can take to work.
Past the Middlesex Avenue light, Route 28 South increases from three lanes to four and divides before reaching a second set of lights at Mystic Avenue (Mystic Avenue light). To enter 1-93 towards Boston, plaintiff maneuvers from the right-hand lane of Route 28 (after merging into that lane from Shore Drive extension) into one of the two left-hand lanes. She has a limited distance, before Route 28 splits, in which to accomplish this maneuver.
Currently, traffic on Route 28 South, including that from the Mall, occasionally backs up from Mystic Avenue light to the Middlesex Avenue light in morning rush hour. However, increased traffic from the proposed Home Depot exiting Middlesex Avenue onto Route 28 South would cause or add to more frequent backups in that stretch of road. Were such backups to increase in frequency and size, they would adversely affect plaintiff in her attempts to cross three to four lanes of traffic to reach 1-93.
Significantly increased Mall traffic would effectively shorten the time and distance plaintiff has in which to execute her lane-crossing maneuver, and would make that maneuver measurably more difficult and dangerous.
The impact on plaintiff of increased Mall traffic would be distinct from that on the general public. First, while other drivers would be able to take another route to avoid the longer Middlesex Avenue light, she would not. Only a handful of other residents must take Shore Drive extension to that light after exiting their driveways. Second, while other drivers heading toward 1-93 would be able to move into the middle or left lane of Route 28 long before its splits, and even before the Middlesex Avenue light, she would not. Unlike the general public, she must be in the far right lane of Route 28 at the Middlesex Avenue light. Only the same handful of other residents would have to cross several lanes of traffic in a shorter distance, when more cars are backed up at the Mystic Avenue light.
Plaintiff would be measurably and distinctly affected by increased traffic from the proposed Home Depot.
Plaintiff has offered credible evidence that the ASLP proposal would measurably increase traffic volume onto Route 28 during the morning rush hour. One of plaintiffs motives in appealing the Decision is the measurable and distinct affect upon her of increased traffic which would result from the ASLP proposal.
RULINGS OF LAW
I. Standing
To establish standing under G.L.c. 40A, §17, a plaintiff must show that she is “aggrieved.” G.L.c. 40A, §17. Thus, plaintiffs must “put forth credible evidence to substantiate claims of injury to their legal rights.”[2] Marashlian v. Zoning Bd. of Appeals of Newburyport, 421 Mass. 719, 723 (1996); see Circle Lounge & Grille, Inc. v. Bd. of Appeal of Boston, 324 Mass. 427, 430-31 (1949). A plaintiffs injury must be sufficiently particularized and distinct from general community interests. Nickerson v. Zoning Bd. of Appeals of Raynham, 53 Mass.App.Ct. 680, 682 (2002) (noting particularized nature of claim is “separate and essential element of standing” as to which court should make specific findings); Harvard Square Defense Fund, Inc. v. Planning Bd. of Cambridge, 27 Mass.App.Ct. 491, 493. While “aggrievement” must not be construed narrowly,[3] injury to the plaintiff cannot be speculative. Marashlian, 421 Mass. at 721. Whether a plaintiff is “aggrieved” is a matter of degree and discretion, and a trial judge’s findings are entitled to deference. Paulding v. Bruins, 18 Mass.App.Ct. 707, 709 (1984); Rafferty v. Sancta Maria Hosp., 5 Mass.App.Ct. 624, 629 (1977).
A. Whether Plaintiff Is Aggrieved
An increase in street traffic that negatively impacts the plaintiff may be sufficient to create standing. Marashlian, 421 Mass. at 721-27. In Marashlian, even though the proposed construction of a hotel across from plaintiffs property would have created a minimal increase in traffic and a decrease in parking spaces,[4] the plaintiffs were nevertheless “aggrieved” within the meaning of G.L.c. 40A, §17.[5] Id. at 722. See Barvenik v. Bd. of Aldermen of Newton, 33 Mass.App.Ct. 129, 133, 135-36 (1992) (suggesting allegations of traffic increases, if supported by credible evidence, are sufficient to show standing in non-commercial context); Bedford v. Trustees of Boston Univ., 25 Mass.App.Ct. 372, 377-78 (1988) (traffic increases harmed plaintiffs property and conferred standing on plaintiff). Traffic concerns are sufficiently distinct from general public interests, such as aesthetic preferences and diminution of open space, which are usually *311 matters of public or community concern. Harvard Square, supra, 11 Mass.App.Ct. at 493 (matters of general public concern insufficient to confer standing); Circle Lounge, supra, 324 Mass. at 430 (impairment of property’s aesthetic appearance by litter insufficient); Bell v. Zoning Bd. of Appeals of Gloucester, 429 Mass. 551, 554 (1999) (concerns regarding project’s suitability to neighborhood, use of tax funds, and parking spaces for public park not specific to plaintiff).
Nevertheless, “mere inconvenience” to the plaintiff, when others in the community are similarly affected by increased traffic, is not sufficient to confer standing. Nickerson, 53 Mass.App.Ct. at 683-84 (plaintiffs hardship of maneuvering through increased traffic “not substantially different” from that of other members of community). The court in Nickerson notes that that plaintiffs aggrievement “may be far less acute than that of many other town citizens," because the plaintiff lived one mile away from the problematic expansion, and because there were intervening intersections and other traffic-generating businesses between the development site and his home. Id. at 684. Here, the plaintiff is more directly affected by increased Mall traffic because of (1) her close proximity to the Mall building, (2) the layout of streets which requires her, whenever she leaves her driveway, to drive into the stream of traffic along Route 28 at a point close to the Middlesex Avenue light, and (3) her particular work commute. Thus, plaintiffs concerns are far more “acute” than those of most others in the community.
Moreover, zoning by-laws may “create and define a protected interest” when specific provisions denote factors that must be taken into account by a board making permit decisions. Monks v. Zoning Bd. of Appeals of Plymouth, 31 Mass.App.Ct. 685, 688 (1994) (by-law provision conditioning grant of permit on maintaining visual character of neighborhood created protected interest in plaintiff); Martin v. The Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints, 434 Mass. 141, 146-47 (2001) (bylaw requiring board to consider visual factor creates protected interest). Here, plaintiffs claim of particularized harm from increased traffic falls within the ambit of an interest noted in the Ordinance, which lists traffic and traffic congestion as factors the Board is to consider when granting permits.
B. Relevance of the Plaintiffs Subjective Motive
A plaintiffs subjective motive is an issue of credibility to be resolved by the trier of fact. Multiple (and arguably contradictory) motives for bringing an appeal will not necessarily destroy standing. See Bedford, supra 25 Mass.App.Ct. at 377-78. In Bedford, a plaintiff brought suit against Boston University to enforce a zoning ordinance, ostensibly to prevent increased traffic, while at the same time he was negotiating a sale of his properly to the University. The court saw “nothing offensive in the plaintiffs negotiations and simultaneous attempts to protect an interest recognized by the zoning law,” where the plaintiff had provided “ample demonstration ... [of] a reasonable likelihood of harm to his property and that the harm was of the type against which the [Boston Zoning] Act is intended to protect.” Id. at 378.
Here, the plaintiff has set forth credible evidence that the ASLP proposal would result in significantly increased traffic, and that she would be distinctly and adversely affected thereby. That her contention of adverse personal impact, thus supported, may be at odds with her membership in the Mystic View Task Force (which arguably supports alternative but equally traffic-generating proposals for re-tenanting the Mall building), is neither so troubling nor so “offensive” as to lead the Court to discredit her evidence of adverse impact.
II. Applicability of Somerville Zoning Ordinance §4.5
By its terms, §4.5 of the Ordinance, “Nonconforming Uses,” applies where the use which is sought to be altered or changed is a preexisting, nonconforming use. It does not apply where the use to be altered or changed is not nonconformingfor example, where the use, even if in existence before the zoning provision at issue, nevertheless conforms to that provision.
This case is notable in that the Mall building itself encompasses both lawful, nonconforming uses (the two “big box” stores on either end, each of which exceeds 10,000 square feet in gross floor area), and conforming uses (the middle part of the building, where the proposed Home Depot would be located).[6] This mix of conforming and nonconforming uses in the same building raises the question whether the “nonconforming use” which the Planning Board may permit to be altered or changed under §4.5 is to be determined by reference to the Mall building as a whole, or to the middle part of the building only.
Defendants ASLP and the City argue that §4.5 applies to the entire Mall building, which includes the two large stores (K-Mart and Building 19), each of which exceeds 10,000 square feet in area, and so are nonconforming under §7.11. Defendants contend that the presence of those two stores renders the entire Mall building a nonconforming use that predates the 1990 Ordinance revision, entitling ASLP’s proposal to special permit/finding treatment under §4.5.
Plaintiff argues that §4.5 applies, if at all, only to the space to be developed, i.e., the middle part of the Mall building, between the K-Mart and Building 19 stores. Because that part has been used only for small retail stores with floor area less than 10,000 square feet, plaintiff contends, such use was a use as of right both before and after the 1990 revision, does not run afoul of the 10,000 square foot restriction, and is *312 therefore a preexisting conforming use not subject to §4.5.
On the evidence at trial, the Planning Board appears not to have considered the issue posed above regarding interpretation of the Ordinance; in particular, the Board appears not to have considered the effect on §4.5, if any, of the Ordinance’s definitions of “building” and “structure” which require, “where the context allows,” that those words “shall be construed ... as though followed by the words ‘or part[s] thereof. ” (See discussion below.) Rather, the Board in its decision seems to have assumed that it could consider only the use of the entire Mall building in deciding whether to allow an alteration of use under §4.5: ‘The proposed renovation and re-tenanting of a portion of the existing retail space for a Home Depot store is an alteration of the lawfully preexisting nonconforming retail use at this site, which has operated as a mall since approximately 1980.” Decision, at 7.
In order to evaluate plaintiffs challenge to the Board’s assumption that §4.5 applies to the entire mall building, the Court must analyze the Ordinance itself. In construing the Ordinance, the Court follows the standard of construction set out in Valcourt v. Zoning Bd. Of Appeals of Swansea, 48 Mass.App.Ct. 124, 128-29 (1999):
In the absence of an express definition, the meaning of a word or phrase used in a local zoning enactment is a question of law, . . . and is to be determined by the ordinary principles of statutory construction. Specific provisions of a zoning enactment are to be read in the context of the law as a whole, giving the language its common and approved meaning ‘without regard to . . . [the court’s] own conceptions of expediency.’ “ A zoning by-law should be construed sensibly, with regard to its underlying purposes, . . . and, if possible, as a harmonious whole
(Citations omitted.)
Article 4 of the Ordinance, “Nonconforming Uses and Structures,” begins with a statement of purpose:
It is the stated purpose of this Article that nonconforming uses . . . are to be strictly regulated, and that the provisions of this Ordinance will be construed and interpreted in the light mostfavorable to limiting the continuation and/or expansion of nonconforming uses and structures.
Section 4.1 (emphasis supplied).
Section 2.2.167 defines “use” as “the purpose for which ... a building or structure is arranged, designed or intended, or for which a . . . building or structure is or may be occupied or maintained” (emphasis added). “Building” and “structure” are each defined (in §§2.2.21 and 2.2.157 respectively), and each definition includes the following sentence: “The word [’building,’ ‘structure’] shall be construed, where the context allows, as though followed by the words ‘or part[s] thereof.’ ”[7]
“Nonconforming use” is defined in §2.2.104 as “[a] use of a structure, [or] building . . . that does not conform to a use regulation prescribed by Article 7 of this Ordinance, provided that such use was in existence and lawful at the time the use regulation became effective.”
The question presented by plaintiff, and by the above-quoted provisions of the Ordinance, is whether the context of §2.2.104 (defining nonconforming use) “allows” the words “building" and “structure" to be interpreted (under §§2.2.21 and 2.2.157) as referring to only part of a building or structurethat is to say, whether §2.2.104 may be construed as though it read as follows: “[Nonconforming use is defined as a] use of a structure, [or part thereof] [or] building [, or part thereof] . . . that does not conform to a use regulation prescribed by Article 7 of this Ordinance, provided that such use was in existence and lawful at the time the use regulation became effective.” If so, then under the Ordinance a building or structure, only part of which contains a nonconforming use, is not to be considered as being completely nonconforming in use: rather, such a building is deemed to have conforming uses in some parts, and nonconforming uses in others.
The Court concludes (1) that the context of the Ordinance’s definition of “nonconforming use,” and of its provisions for changes and alterations of nonconforming uses in Article 4, “allows" the words “building” and “structure” (as used or referred to in those sections) to be construed as though followed by the words “or part thereof,” and therefore (2) that those provisions “shall” be so construed. §§2.2.21, 2.2.157. There is no reason why there may not be conforming uses in one part of a building or structure, and nonconforming uses (lawful or not) in another. Cf. Powers v. Building Inspector of Barnstable, 363 Mass. 648, 661 (former schoolhouse had lawful nonconforming use on one floor, and different, unlawful nonconforming use on another).
The Powers case is instructive in another way. While defendants correctly point out that the present case does not raise the question which Powers decided (i.e., whether a preexisting, nonconforming use had been expanded or changed to the point where it ceased to be lawful), Powers nevertheless involved zoning by-laws which “included the provision that any lawful building or lawful use of a building or premises or part thereof existing at the time the by-law was adopted might be continued . . .” Powers v. Building Inspector of Barnstable, supra, 363 Mass. at 650 (emphasis added). The Supreme Judicial Court states that this by-law “was in accord with the statutory provision of [the zoning enabling act (now G.L.c. 40A)J” that prohibits appli *313 cation of a zoning ordinance to “the existing use of any building or structure .. .” Id. at 650-51.
Powers thus supports a conclusion in this case that it is consistent with c. 40A to construe Article 4 of the Ordinance as applying to those parts of buildings which contain nonconforming uses, rather than to the entirety of any building a part of which happens to contain nonconforming uses.
Such a construction of Article 4 is bolstered by the statement of purpose in §4.1 that nonconforming uses are to be “strictly regulated,” and that the provisions of the Ordinance are to be “construed and interpreted in the light most favorable to limiting the continuation and/or expansion of nonconforming uses . . .” That purpose is best achieved by construing the Ordinance’s defined term “nonconforming uses” so as to limit their expansion. Where a building is used in part for purposes allowed as of right by the current Ordinance, and in part for purposes which are not (but which are lawful preexisting uses), the Ordinance’s goal of limiting the expansion of the latter is advanced by construing Article 4 so as to allow regulation of proposed changes to conforming uses without reference to their nonconforming neighbors, at least where such construction will apply a higher standard to such proposed changes.
Of course, where the proposed change is not to the conforming part of the building but to the nonconforming part, whether by change of such use or by expansion of it into conforming areas (e.g., were ASLP proposing to expand the existing K-Mart into the middle of the Mall building), Article 4, and §4.5, would presumably apply.
In this case, ASLP’s proposal is to replace the middle part of the Mall building (which was designed, approved, and used for multiple, small retail stores having less than 10,000 square feet floor area) with a single Home Depot retail store well in excess of 10,000 square feet. The two large (and lawfully nonconforming) retail stores on either side of the middle part will remain, and there is no suggestion that the operations of those stores will be expanded or altered. ALSP Proposed Findings 30-31. In the circumstances of this case, and in light of the Court’s conclusions above, the provisions of §4.5.3, regulating “alteration ... of a lawfully existing nonconforming use,” should be construed to refer to alteration of a nonconforming use in that part of the Mall building where such use exists (i.e., the two ends). Because ASLP’s proposal affects only that part of the Mall building (the middle) where there is no nonconforming use, §4.5.3 is not applicable to ASLP’s proposal. For the same reasons, §4.5.1 is inapplicable, to the extent that ASLP’s proposal might be characterized as seeking a “change of nonconforming use.”
The consequence of the above analysis is that ASLP’s proposal is subject to the provisions of §7, requiring that, in the Business Park Assembly district, retail store uses in excess of 10,000 square feet are subject to “special permit with site plan review.” Section 7.11. The Ordinance defines “special permit with site plan review” as follows:
A special approval, being a form of Special Permit, with the added purpose of allowing for more thorough review of a project which, due to its size or nature, is likely to have significant impacts upon the district within which it is located or on the City as a whole.
Section 2.2.149. That definition, in the circumstances of this casewhere the proposed alteration to the existing use of the middle part of the Assembly Square Mall building can fairly be expected, “due to its size or nature, ... to have significant impacts upon the district within which it is located [and] on the City as a whole’’does not detract from a construction of §4.5 which causes the ASLP proposal to be subject to special permit with site plan review under §7.11.
The Court therefore concludes that the Ordinance, construed in the circumstances of this case in accordance with “the ordinaiy principles of statutory construction, . . . with regard to its underlying purposes, . . . and ... as a harmonious whole,” Valcourt v. Zoning Bd. Of Appeals of Swansea, supra, 48 Mass.App.Ct. at 129, provides that §4.5 does not apply to that part of the mall building in which the use conforms to §7.11. The Court must next determine what relief it should grant where the Board has nevertheless approved the special permit/finding under §4.5.
Had the Board addressed the issue of construction of the Ordinance considered above, the Court would be required to give some deference to the Board’s interpretation of its own Ordinance. The degree of deference due is not precisely measured. “A zoning board of appeals is entitled to ‘all rational presumptions in favor of its interpretation of its own by-law, [provided] there [is] a rational relation between its decision and the purpose of the regulations it is charged with enforcing.’ ” Building Com’r of Franklin v. Dispatch Communications of New England, Inc., 48 Mass.App.Ct. 709, 713 (2000). Compare Apt Asset Management, Inc. v. Board of Appeals of Melrose, 50 Mass.App.Ct. 133, 138 (2000) (ordinance to be construed in accordance with ordinary principles of statutory construction, with “some measure” of deference given to the board’s interpretation).
In some cases where a zoning or planning board • has failed to interpret a key provision or provisions of the zoning ordinance, the Appeals Court has required that the issue be remanded for further consideration in light of the court’s opinion. For example, in Duteau v. Zoning Board of Appeals of Webster, 47 Mass.App.Ct. 664 (1999), an individual applied for a special permit allowing him to carry on *314 a small engine repair business in a residential zone. The board responded to the application not with the grant of a special permit but the grant of a favorable “finding” that, in essence, the proposed business was allowable as of right as a home occupation. The Appeals Court, noting that “(declassifying the nature of the relief sought was within the board’s authority,” id. at 666, nevertheless faulted the board for failing adequately to determine whether there was compliance with the text of the by-law governing home occupations:
Implicit in the board’s decision, but not mentioned in it, is a finding that, under the by-law, such noise as the engine repair work produced did not rise to a level of “external manifestation.” It is a not inconsiderable weakness of the board’s decision that it contains no analysis of that key phrase in the by-law.
We think it necessary that the case be remanded to the board for reconsideration whether [the applicant] is entitled to use the premises for the repair of small engines. The board needs to make more definitive findings as to the noise generated by engine repair work, . . . and whether, in the view of the board, that is or is not an external manifestation within the meaning of Webster's by-law. In that regard, although interpretation of the by-law is in the last analysis a judicial function, deference is owed to a local zoning board’s home grown knowledge about the history and purpose of its town’s zoning by-law.
Id. at 668-69.
Similarly, in Berkshire Power Development, Inc. v. Zoning Bd. Of Appeals of Agawam, 43 Mass.App.Ct. 828 (1997), the court stated that “ ‘the board’s administrative view is valuable and is wanted.’ . . . Thus it is that ‘[w]e give substantial deference to the construction placed on ... an ordinance by the agency charged with its administration,’ i.e., the board of appeals.” Id. at 832 (citations omitted). Where the board in Berkshire Power applied provisions of the zoning code including standards for grant of a special permit, and denied the application because of the failure of a unanimous vote, “the judge’s authority, if he disagreed with the board, would be limited to remanding the application to the board for further consideration in light of the judge’s opinion.” Id. at 833.
While the quoted language in Berkshire Power might be explained, in part, by the “deference and latitude accorded zoning boards, especially in connection with denials of special permits,” Kennard v. Zoning Bd. Of Appeals of Eastham, 52 Mass.App.Ct. 1105 (2001), the Court concludes that in this case, where the Board allowed the petition, it nevertheless did so without addressing a key phrase of the Ordinance on which its decision depends. Here, in the words of Duteau, “(i]mplicit in the board’s decision, but not mentioned in it, is a finding that, under the by-law,” the contexts of the definition of nonconforming use, and of the provisions of Article 4, do not allow the words “building” and “structure” to be construed as though followed by the words “or part thereof.” As in Duteau, “(i]t is a not inconsiderable weakness of the board’s decision that it contains no analysis of that key phrase in the by-law.” Duteau, supra, 47 Mass.App.Ct. at 668.
While the Court has determined that §4.5 does not apply to that portion of the Mall building which is the subject of ASLP’s proposal, it has done so without benefit of the Board’s analysis of its own Ordinance, and declines at this stage to annul the Board’s decision. Accordingly, the case will be remanded to the Board for reconsideration in light of this decision. Remand is an interlocutory order, and therefore no judgment will enter. Lovaco, Inc. v. Zoning Bd. of Appeals of Attleboro, 23 Mass.App.Ct. 239, 244 (1986).
INTERLOCUTORY ORDER
For the reasons stated above, the case is ORDERED remanded to the Somerville Planning Board for reconsideration in light of the foregoing. No judgment will issue at this time. After the Planning Board has issued its decision on reconsideration, it shall serve and file the decision, and the parties shall, within two weeks of the filing thereof, serve and file written submissions stating their views as to the next steps necessary for resolution of this case.

The parties have stipulated that plaintiff is not an abutter and thus is not presumed to have standing. See 421 Mass. at 721 (articulating standard for abutter of zoned property).

For example, the court in Marashlian declined to follow Barvenik v. Bd. of Alderman of Newton, 33 Mass.App.Ct. 129 (1992), which “seem[s] to require” a plaintiff to “show a substantial likelihood of harm greater than that which could result from a use of the property permissible as of right.” Marashlian, 421 Mass. at 724.

The Marashlian court notes that although the trial judge ultimately did not find the reduction in parking space to be injurious, that finding bears only on the merits, not standing. Id at 722.

It is worth noting that here, as in Marashlian, the plaintiffs properly is in a zoning district that is more restricted than the zoning district in which the defendants’ property is located.

There is no contention that the middle part of the Mall building, now vacant, was ever used for other than small retail stores which complied with the current Ordinance.

The Ordinance’s use of “parts” in §2.2.21 and “part” in §2.2.157 may signify inconsistent draftsmanship, but does not appear to pose any significant difference in meaning between the two definitions.